MCM PARTNERS, INCORPORATED, Plaintiff–Appellant,

v.

ANDREWS–BARTLETT & ASSOCIATES, INCORPORATED, doing business as Andrews–Bartlett Exposition Services, et al., Defendants–Appellees.

No. 94–3019.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 5, 1995.

Decided Aug. 11, 1995.

---

Antitrust Act, 15 U.S.C. § 1, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) & (d), when they refused to rent forklifts and other material handling and personnel moving equipment from MCM. The district court dismissed MCM's antitrust claim with prejudice, and after permitting MCM to replead its RICO claims, found that MCM also had failed to state a claim under that statute. The district court found from the allegations in MCM's complaint that the exhibition contractors had been coerced by O.G. Service Corporation ("OG"), a competing rental equipment company, and individuals acting on its behalf into refusing to deal with MCM. The court concluded that, as coerced parties, neither of the contractors could be considered conspirators under section 1 of the Sherman Act or section 1962(d) of RICO. The court also dismissed MCM's claim under section 1962(c) because neither defendant met the test for liability set out in *Reves v. Ernst & Young*, — U.S. —, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). In this appeal, MCM challenges the dismissal of all three claims.[1] It argues that even if coerced by a third party, the exhibition contractors are not immune from liability for a conspiracy under the Sherman Act or RICO. It also contends that the dismissal of its section 1962(c) claim under *Reves* was erroneous. For the reasons that follow, we vacate the dismissal of all three claims and remand for further proceedings.

Kenneth A. Jenero, McBride, Baker & Coles, Chicago, IL, Richard P. Campbell, Anthony S. DiVincenzo (argued), Campbell & DiVincenzo, Chicago, IL, Terrence M. Jordan, Chicago, IL, for MCM Partners, Inc.

Jeffrey M. Carey, Chicago, IL, John J. Eklund (argued), John P. Susany, Calfree, Halter & Griswold, Cleveland, OH, for Andrews–Bartlett & Associates, Harold Bartlett, Bonnie Aaron.

William C. Holmes, James McConnell (argued), William A. Spence, Thomas Kottler, Freeborn & Peters, Chicago, IL, Jerry C. Alexander, James F. Adams, Joshua P. Oden, Passman & Jones, Dallas, TX, for Freeman Decorating Co., Dale Leithleiter, Doug Vanorg.

Before RIPPLE and ROVNER, Circuit Judges, and MILLER, District Judge.*

ILANA DIAMOND ROVNER, Circuit Judge.

MCM Partners, Incorporated ("MCM") alleged that two exhibition contractors who staged conventions and trade shows at Chicago's McCormick Place violated the Sherman

## I. BACKGROUND

Because we are reviewing a dismissal at the pleading stage, we take MCM's allegations at face value. *See Land v. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Health and Welfare Fund*, 25 F.3d 509, 511 (7th Cir. 1994). We accordingly describe the facts as they are alleged in MCM's initial complaint and its second amended complaint.[2]

---

\* The Honorable Robert L. Miller, Jr., of the Northern District of Indiana, sitting by designation.

1. The district court also dismissed MCM's claims under section 2 of the Sherman Act, 15 U.S.C. § 2, and section 3 of the Clayton Act, 15 U.S.C.

§ 14. MCM has not challenged the dismissal of those claims in this appeal.

2. The second amended complaint addressed only MCM's RICO claims, as the district court had

MCM brought its initial complaint against not only the exhibition contractors—Andrews-Bartlett & Associates, Incorporated ("A-B") and Freeman Decorating Company ("FDC")—and their principals, but also against OG and its principal, Nick Boscarino. The two complaints are a bit convoluted, but the essence of both the antitrust and RICO claims is simple enough—that OG conspired with A-B and FDC to monopolize the market for the rental of forklifts and material handling and personnel moving equipment at McCormick Place, thereby excluding MCM as a competitor in that market. MCM alleges in that regard that the conspiracy enabled OG to procure 100 percent of the McCormick Place rental market. The facts leading to the creation of this monopoly are alleged to be the following.

Prior to April 1991, only OG and AIM Industrial Lift Truck ("AIM") were in the business of providing forklifts and other material handling and personnel moving equipment to exhibition contractors at McCormick Place. In April 1991, however, MCM began to compete with OG and AIM for this exhibition business.[3] MCM alleged that at that point it procured an order from A-B for the rental of forklifts and other heavy machinery for one of A-B's upcoming McCormick Place shows. Boscarino learned of this order in May 1991, and he contacted National Lift Truck ("NLT"), whom he knew would be leasing certain equipment to MCM to be used at the A-B show. Boscarino told an NLT principal that unless NLT terminated any relationship with MCM in relation to the buildings and facilities at McCormick Place, NLT's property would be in jeopardy. MCM also alleged that another OG employee, Cliff Larson, made a call to NLT the following day, threatening that the NLT forklifts rented by MCM would be damaged unless the business relationship was terminated. Indeed, on the day following Larson's threat, one of the rented forklifts was damaged when it was rammed in the side by another forklift.

By letter dated January 17, 1992, A-B committed to utilize MCM equipment for a number of its shows throughout the year. For instance, A-B agreed that MCM would serve as its primary supplier of gas scooters at McCormick Place for the entire calendar year, and that MCM would provide either 50 or 100 percent of A-B's forklift requirements for designated trade shows. The letter noted that A-B "look[ed] forward to this working relationship and the possibility of maintaining and expanding our relationship throughout the year." (R. 1, Ex. A.) In accordance with this letter, A-B's equipment manager delivered two purchase orders for forklifts and gas scooters to MCM on April 14, 1992. Less than one week later, however, A-B sent to MCM the following notice canceling those purchase orders:

> We regret to inform you that due to an advance agreement between O.G. Service and Andrews-Bartlett Exposition Services Corporate office, we must cancel [the April 14, 1992] purchase orders.... I have been informed by my corporate office that any and all equipment required by our Chicago operation will be provided by O.G. Services.

(R. 1, Ex. D.) MGM alleged that prior to A-B's cancellation of the two purchase orders, Boscarino met with two A-B managers, who informed him of A-B's ongoing relationship with MCM. Boscarino told the managers that Bill Hogan, who was president of the local branch of the International Brotherhood of Teamsters (the "Teamsters"), was "not going to like" the fact that A-B was doing business with MCM. Upon learning of the A-B/MCM agreement, Hogan met with A-B's president, Harold Bartlett, on April 17, 1992, and agreed to grant A-B certain work rule concessions. It was after this meeting that Bartlett directed his Chicago managers to cancel the MCM purchase orders and to terminate any business relationship with MCM at McCormick Place.

Consistent with these specific allegations, MCM generally alleged that both A-B and FDC proceeded, at the direction of Hogan, to

---

dismissed the Sherman Act claim in MCM's initial complaint with prejudice.

**3.** In the fall of 1991, OG purchased the assets of AIM, leaving MCM as OG's sole competitor at McCormick Place.

lease forklifts and other material and personnel handling equipment at McCormick Place only from OG, whose principal (Boscarino) was a steward of the Teamsters' local branch. According to MCM, whenever either exhibition contractor took any steps that were inconsistent with Hogan's directive in this regard, the contractor was subject to discipline by the Teamsters, including threats of labor strikes and damage to property. As a result, since August 1992, A–B and FDC have exclusively used OG for their rental equipment needs at McCormick Place. Because the effect of defendants' actions was to provide OG with a virtual monopoly at the convention center, defendants paid rates for OG's rental equipment that were higher than the prevailing market rates.[4]

From these factual allegations, MCM advanced claims under two federal statutes. First, MCM maintained that defendants had violated section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to monopolize the market for the rental of forklifts and other material handling and personnel moving equipment at McCormick Place. The conspiracy's purpose, the complaint alleged, was to raise or stabilize the price of rental equipment either by excluding MCM from the market or by substantially limiting its ability to compete with OG. MCM was successfully excluded because Boscarino procured agreements from both A–B and FDC not to deal with MCM and to instead use OG for all of their rental equipment needs. MCM therefore alleged that actual and potential competition in the relevant market was restrained or eliminated altogether. MCM asked that the Sherman Act violation be enjoined and

that it recover treble the damages it incurred.

MCM alleged, in addition, that defendants' conduct also violated RICO sections 1962(c) & (d). The predicate acts allegedly constituting a pattern of racketeering activity were defendants' payments to OG for the rental of equipment at McCormick Place at higher than market rates. MCM alleged that these payments violated section 302 of the Taft–Hartley Act, 29 U.S.C. § 186, as they were payments by an employer to a union representative of its employees.[5] In its RICO count, MCM also prayed for treble damages and injunctive relief.

After filing its original complaint, MCM voluntarily dismissed OG and Boscarino,[6] and the remaining defendants then moved to dismiss for failure to state a claim. The district court permitted MCM to replead its RICO claims but dismissed the antitrust claim with prejudice. See *MCM Partners, Inc. v. Boscarino*, 1994–1 Trade Cas. (CCH) ¶ 70,547, 1994 WL 63163 (N.D.Ill. Feb. 17, 1994). The district court subsequently dismissed the RICO claims that MCM realleged in a second amended complaint. (*See* R. 107.) The court determined that neither the antitrust nor the RICO claims could survive MCM's voluntary dismissal of OG and Boscarino. In the court's words, the dismissal of these defendants "left a racketeering count with no racketeer and an antitrust suit with no monopoly." 1994–1 Trade Cas. (CCH) ¶ 70,547, at 71,958. Finding from the allegations in MCM's complaint that A–B and FDC had been coerced into dealing exclusively with OG at McCormick Place, the court held that a coerced party could not be liable as a co-

---

4. MCM alleged that A–B and FDC controlled 75 percent of the convention and trade show business at McCormick Place in 1992 and that the remaining 25 percent was divided between United Exposition Services and several smaller exposition contractors. These contractors also refused to rent from MCM at McCormick Place, as they allegedly had been told that problems would develop with the Teamsters if they used a rental equipment company other than OG.

5. Section 186 provides, *inter alia,* that:
 (a) It shall be unlawful for any employer or association of employers ... to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

 (1) to any representative of any of his employees who are employed in an industry affecting commerce; or
 (2) to any labor organization or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce.

6. The record does not reveal MCM's reason for dismissing these defendants, although it apparently relates to the fact that MCM previously had sued OG and Boscarino but had settled its claims in that case.

conspirator under RICO or the Sherman Act. The court also found that a coerced party could not operate or manage a racketeering enterprise under RICO section 1962(c).

## II. DISCUSSION

 We review the dismissal of MCM's complaint de novo, accepting as true the complaint's well-pleaded factual allegations and drawing all reasonable inferences from those allegations in MCM's favor. *Leatherman v. Tarrant County Narcotics Unit,* — U.S. —, —, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517 (1993); *Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640, 644 (7th Cir. 1995). We will affirm the dismissal of MCM's complaint "only if it 'appears beyond doubt that [MCM] can prove no set of facts in support of [its] claim which would entitle [it] to relief.'" *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 421 (7th Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). We apply that liberal standard first to MCM's antitrust claim and then to its RICO claims.

### A. Sherman Act Claim

#### 1. Contract, Combination, or Conspiracy

The district court viewed MCM's claim under section 1 of the Sherman Act[7] as somewhat unique:

> Instead of a conspiracy of sellers to raise prices, we have a conspiracy of *buyers* to raise prices by entering into exclusive dealing arrangements, coerced by threats of labor disruption by a union official in cahoots with the would-be monopolist. As a consequence, [MCM] is unable to compete and prices for rental equipment at McCormick Place have allegedly been artificially inflated. But what makes this suit truly extraordinary is that [MCM] is not suing the would-be monopolist but the victims forced to deal with it.

1994–1 Trade Cas. (CCH) ¶ 70,547, at 71,953 (district court's emphasis). The court concluded, however, that MCM had failed to state a claim for relief under section 1 because it had not adequately alleged a contract, combination, or conspiracy in restraint of trade. The district court believed that "[t]he only reasonable inference to be drawn from the facts alleged in the Complaint [was] that A–B and FDC's agreement to deal exclusively with OG was motivated by their desire to avoid labor trouble and damage to the rented equipment." *Id.* at 71,954. In the court's view, this "hardly suggests a meeting of the minds with OG or Boscarino," as "[t]he person who 'agrees' to give a gunman his wallet is not a co-conspirator." *Id.* MCM contends in this appeal that, contrary to the import of the district court's opinion, coercion is not an absolute defense to conduct that otherwise violates section 1. According to MCM, a coerced party that acquiesces in the unlawful conduct of another is considered a co-conspirator of its coercer and may thus be held accountable under the antitrust laws.

 If A–B or FDC had independently exercised its business judgment to refuse to rent equipment from MCM at McCormick Place, that decision would not be actionable under section 1 of the Sherman Act. *See Monsanto v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). A party may independently decide with whom it will deal, and it may, without running afoul of section 1, decide to direct all of its business to a single supplier. Yet MCM's allegations suggest that A–B and FDC did not make independent business decisions here. Instead, MCM alleged that A–B and FDC decided to deal exclusively with OG at McCormick Place only in response to threats of labor disruption and damage to property made by Hogan, Boscarino, or oth-

---

7. Section 1 provides in pertinent part that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . .

15 U.S.C. § 1. In order to state a claim under that section, a plaintiff must allege: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Denny's Marina, Inc. v. Renfro Prods., Inc.,* 8 F.3d 1217, 1220 (7th Cir.1993).

ers on behalf of OG. Indeed, MCM alleged that in both 1991 and 1992, it had procured contracts with A–B to supply equipment for certain of A–B's McCormick Place exhibitions. A–B canceled those agreements, according to the complaint, only in response to pressure and threats from Boscarino and Hogan.[8] The allegations therefore support the inference that both A–B and FDC acquiesced to the demands of Boscarino and Hogan that they deal only with OG in renting forklifts and other material handling and personnel moving equipment at McCormick Place.

A–B and FDC argue, however, and the district court found, that their acquiescence did not establish a combination or conspiracy for purposes of section 1 because the complaint itself indicated that A–B and FDC acted only at the direction of and in response to pressure applied by OG and its principals—that is, that they were coerced victims of OG's scheme. But the district court's holding in that regard is without support in the case law interpreting section 1. In *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 161, 68 S.Ct. 915, 931, 92 L.Ed. 1260 (1948), for example, the Supreme Court dispatched a similar argument in short order:

> There is some suggestion ... that large exhibitors with whom defendants dealt fathered the illegal practices and forced them onto the defendants. But as the District Court observed, that circumstance if true does not help the defendants. For acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one.

Later courts have applied this principle in a variety of settings, concluding that the "combination or conspiracy" element of a section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion. *See, e.g., Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 142, 88 S.Ct. 1981, 1986, 20 L.Ed.2d 982 (1968) (plaintiff could allege a conspiracy between a manufacturer and the franchise dealers who acquiesced in the manufacturer's demands); *Albrecht v. Herald Co.,* 390 U.S. 145, 150 & n. 6, 88 S.Ct. 869, 872 & n. 6, 19 L.Ed.2d 998 (1968); *United States v. Parke, Davis and Co.,* 362 U.S. 29, 45, 80 S.Ct. 503, 512, 4 L.Ed.2d 505 (1960); *City of Vernon v. Southern California Edison Co.,* 955 F.2d 1361, 1371 (9th Cir.) ("a conspiracy to monopolize may exist even where one of the conspirators participates involuntarily or under coercion."), *cert. denied,* —— U.S. ——, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992); *Duplan Corp. v. Deering Milliken, Inc.,* 594 F.2d 979, 982 (4th Cir.1979) (coercion no defense in horizontal conspiracy involving patent), *cert. denied,* 444 U.S. 1015, 100 S.Ct. 666, 62 L.Ed.2d 645 (1980); *Calnetics Corp. v. Volkswagen of Am., Inc.,* 532 F.2d 674, 682 (9th Cir.) ("The involuntary nature of one's participation in a conspiracy to monopolize is no defense. An antitrust conspirator can be liable for damages even though he participates only under coercion."), *cert. denied,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976); *Flintkote Co. v. Lysfjord,* 246 F.2d 368, 375 (9th Cir.) ("Because one is coerced by economic threats to participate in or aid and abet an illegal scheme does not excuse the actor."), *cert. denied,* 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); *C & W Constr. Co. v. Brotherhood of Carpenters and Joiners of Am., Local 745,* 687 F.Supp. 1453, 1462–63 (D.Haw.1988) (suppliers coerced by labor union to refuse to deal with the plaintiff were co-conspirators under section 1); *Oltz v. St. Peter's Community Hosp.,* 656 F.Supp. 760, 763 (D.Mont.1987) (hospital board of trustees

---

8. In its second amended complaint filed after the dismissal with prejudice of its section 1 claim, MCM also alleged that Hogan, on April 17, 1992, agreed to grant A–B certain work rule concessions if it terminated its business relationship with MCM and rented equipment at McCormick Place only from OG. Although the district court had no opportunity to consider this allegation in connection with MCM's antitrust claim, it suggests that A–B's actions may not have been entirely coerced, as A–B was able to negotiate concessions from the Teamsters in return for conduct in conformance with Hogan's wishes. Because the allegation was not before the district court, however, and because MCM does not allege that FDC received similar concessions, we will disregard that additional allegation when considering MCM's antitrust claim and will treat A–B and FDC both as coerced parties. On remand, however, MCM should be afforded the opportunity to include this potentially significant allegation in an amended complaint.

that bowed to pressure from anesthesiologists in refusing to continue to deal with the plaintiff held to have conspired with the anesthesiologists), *aff'd*, 861 F.2d 1440, 1451 (9th Cir.1988); *Linseman v. World Hockey Ass'n*, 439 F.Supp. 1315, 1321–22 (D.Conn. 1977) ("Courts have uniformly rejected any defense that an antitrust violation was 'forced' onto the defendant."); *Otto Milk Co. v. United Dairy Farmers Coop. Ass'n*, 261 F.Supp. 381, 385 (W.D.Pa.1966) ("even if one is coerced by economic threats or pressure to participate in an illegal scheme, that does not make him any less a co-conspirator."), *aff'd*, 388 F.2d 789, 797 (3d Cir.1967); *Commonwealth Edison Co. v. Allis–Chalmers Mfg. Co.*, 245 F.Supp. 889, 892–93 (N.D.Ill.1965) (striking economic coercion defense in horizontal price fixing case as inconsistent with *Paramount Pictures* ). Our cases, too, have adhered to this general principle. *See Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1163 (7th Cir.1987) ("The fact that Isaksen may have been coerced into agreeing is of no moment; an agreement procured by threats is still an agreement for purposes of section 1."), *cert. denied*, 486 U.S. 1005, 108 S.Ct. 1728, 1729, 100 L.Ed.2d 193 (1988).

A–B and FDC acknowledge that courts traditionally have found concerted action even where at least one of the alleged conspirators may have been coerced, but they argue that the purpose of finding a conspiracy in that instance is to provide the coerced party or an injured third party with a remedy *against the coercer*. Defendants maintain that a combination or conspiracy should not be found when a third party seeks recovery *from the coerced party itself.* Under defen-

dants' theory, then, treatment of the identical conduct would vary under section 1 based upon the identity of the defendant. Yet nothing in the text of the Sherman Act or in the Supreme Court's interpretation of that statute suggests to us that the defendant's identity is at all relevant to whether or not there was an actionable contract, combination, or conspiracy. Moreover, it would be logically inconsistent to find a conspiracy only when the coercing party is sued, as the conduct relevant to the conspiracy determination is the same if only the coerced party is targeted.

Defendants, however, find some support for their theory in Professor Areeda's treatise. *See* VI P.E. Areeda, *Antitrust Law* ¶ 1408 (1978 & 1994). There, the author explains that a judicial desire to protect "the coerced party has often been the impulse behind proclaiming coerced compliance to be a conspiracy," and he therefore argues that courts should be "wary of extending the same proclamation to cases in which the coerced party is the defendant." *Id.* at 45. Areeda concedes, however, that "judicial declarations on the matter provide little comfort for coerced parties" because "the legal convention of treating express promises in the vertical context as [section] 1 contracts or conspiracies is well established notwithstanding an unwilling dealer." *Id.* at 45, 48. Indeed, neither A–B nor FDC can cite a single case which holds that a section 1 conspiracy exists only where the coerced party or an injured third party seeks a remedy against the coercer.[9] Professor Areeda acknowl-

---

**9.** FDC maintains that two more recent decisions "buttress" its argument (FDC Br. at 14–15 (citing *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171 (3d Cir.1992)), *cert. denied*, ―― U.S. ――, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993); *Garshman v. Universal Resources Holding, Inc.*, 625 F.Supp. 737 (D.N.J.1986)), yet neither case holds that concerted action is absent when the coerced party is named as a defendant. In *Fineman*, the Third Circuit considered whether the plaintiff had shown a conspiracy between a manufacturer and one of its distributors where the manufacturer had pressured the distributor into refusing to deal with one of its competitors. 980 F.2d at 212. The district court directed a verdict for the defendant manufacturer on the ground that no conspiracy had been established because the distributor did not share the manufacturer's

purpose of eliminating the competitor from the market. *Id.* The Third Circuit reversed, believing that the district court's ruling would have the effect of rendering "section 1 unavailable to private litigants suffering antitrust injury as a result of concerted action in a vertical matrix." *Id.* The court held that a conspiracy could be found in that circumstance even if the manufacturer and distributor had different motives for engaging in anticompetitive conduct. *Id.* at 215. In reaching that conclusion, the court mentioned Professor Areeda's suggestion that a distributor should not always be subject to liability when coerced by a manufacturer. Yet that question was not actually presented in *Fineman*, as the coerced distributor had not been sued. *Id.* The court addressed the point only to show that Pro-

edges, moreover, that courts have found conspiracies even where the coerced party is the defendant. *Id.* at 48 (citing *Calnetics Corp.*, 532 F.2d at 682); *see also, e.g., Paramount Pictures,* 334 U.S. at 161, 68 S.Ct. at 931; *Flintkote,* 246 F.2d at 375–76. In advocating a more flexible rule that takes into account a variety of case-specific factors, Areeda is primarily concerned with the potential injustice of imposing treble damage liability against a coerced party who "may seem more a victim than a sinner." VI Areeda, ¶ 1408, at 46, 48. That potential is particularly acute, Areeda argues, in cases involving a vertical relationship because the coerced party may find it difficult to distinguish unlawful and anticompetitive threats from "lawful persuasion." *Id.* at 48.

Even given the legitimacy of Professor Areeda's concerns, however, we do not find this an appropriate case to depart from the traditional rule, as MCM's allegations permit the inference that A–B and FDC must have realized that the "persuasion" applied by OG and its principals was unlawful. MCM alleged that both A–B and FDC were induced by threats of labor disruption and of damage to property to rent all of their forklifts and other material handling and personnel moving equipment from OG. At the time these threats were made, A–B had already committed some of its rental business to MCM, but it canceled those commitments after being threatened by Boscarino and Hogan. Taking these allegations as true, A–B and FDC knew or should have known that OG's attempt by such means to procure and to further exclusive dealing relationships would have the effect of excluding MCM from McCormick Place and eliminating competition in that venue. A–B and FDC must have realized, then, that OG's conduct was probably unlawful under the antitrust laws. *Cf. C & W Constr. Co.,* 687 F.Supp. at 1463. So long as defendants knew that they were acquiescing in conduct that was in all likelihood

unlawful, we have no difficulty concluding that they thereby joined a combination or conspiracy for which they can be held accountable under section 1. *See Albrecht,* 390 U.S. at 150, 88 S.Ct. at 871; *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 214 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993); *Flintkote,* 246 F.2d at 375–76; *C & W Constr. Co.,* 687 F.Supp. at 1463; *see also Syufy Enter. v. American Multicinema, Inc.,* 793 F.2d 990, 1001 (9th Cir.1986), *cert. denied,* 479 U.S. 1031, 1034, 107 S.Ct. 876, 884, 93 L.Ed.2d 830, 838 (1987); II E.W. Kintner, *Federal Antitrust Law* § 9.17, at 34 (Supp. 1995); VI Areeda, ¶ 1408, at 44. Indeed, the acquiescence of A–B and FDC was essential to the success of OG's scheme, as only those companies had the ability to effectively exclude MCM from the McCormick Place market by refusing to rent its equipment. *See Duplan Corp.,* 594 F.2d at 982.

Although the evidence itself may establish that A–B and FDC made independent business decisions in renting equipment only from OG, MCM's conspiracy allegations were sufficient to survive a motion to dismiss.

### 2. Relevant Market

The district court alternatively found that MCM had failed to plead facts supporting its definition of the market where competition allegedly had been restrained. MCM defined the market as "the rental of forklifts, material handling and personnel moving equipment to the convention and trade show industry in Chicago, Illinois." (R. 1, ¶ 72.) It alleged that the "vast majority" of Chicago's convention and trade show business is conducted at McCormick Place and that the consumers in that market are the "exhibition contractors who set up, install, and disassemble the booths and other physical items" used in the industry. (*Id.* at ¶ 72(a).) The district court believed that these allegations defined the market too narrowly because the com-

---

fessor Areeda would find a conspiracy in the case actually before the court even if the distributor had its own motives for acquiescing in the manufacturer's plan. *Id.*

In *Garshman,* the court also discussed Professor Areeda's treatise and was reluctant to find a

conspiracy where such a finding would subject a possible victim of coercion to liability for treble damages. 625 F.Supp. at 743. Yet the court did not base its decision on that ground, as it found other defects warranting dismissal of the complaint even if the facts alleged would support an inference of conspiracy. *Id.*

plaint did not include facts establishing that the market for MCM's equipment was limited to exhibition contractors. In the absence of such allegations, the court took judicial notice of the fact that forklifts and material handling and personnel moving equipment are subject to widespread industrial use, and it therefore found MCM's narrowly-defined market "so improbable" that the suit should not proceed. *MCM Partners*, 1994–1 Trade Cas. ¶ 70,547, at 71,956.[10] MCM contends on appeal that its relevant market allegations were sufficient to withstand a motion to dismiss and that its proof at trial would establish that the equipment rented by MCM and OG to exhibition contractors at McCormick Place was unique in that it could not readily be used in other locations for other purposes. *See Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 481–82, 112 S.Ct. 2072, 2089–90, 119 L.Ed.2d 265 (1992) (proper market definition requires factual inquiry into commercial realities faced by consumers). MCM therefore contends that the district court should not have rejected its definition of the relevant market as a matter of law based solely on the allegations in its complaint.

■■■ To state a claim for relief under section 1, a plaintiff must allege either that the contract, combination, or conspiracy resulted in a *per se* violation of the Sherman Act or that it unreasonably restrained competition in a relevant market. *See Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir.1993); *Banks v. National Collegiate Athletic Ass'n*, 977 F.2d 1081, 1088 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2336, 124 L.Ed.2d 247 (1993); *Dos Santos v. Columbus–Cuneo–Cabrini Med. Ctr.*, 684 F.2d 1346, 1352 (7th Cir.1982). In the instant case, MCM did not attempt to make out a *per se* violation of section 1 but alleged instead that OG, A–B, and FDC restrained competition in the market for rental equipment at McCormick Place by effectively eliminating MCM as a competitor in that market and thereby securing a virtual monopoly for OG. According to MCM, this had the effect of permitting OG to charge higher

than market rates for the rental of its equipment at that facility. Assuming that McCormick Place can be characterized as a relevant market, then, these allegations were sufficient to allege an unreasonable restraint on competition.

■■■ The district court found it highly improbable, however, that the market could be limited to exhibition contractors in the convention and trade show industry because the equipment rented by MCM had a number of alternative uses. 1994–1 Trade Cas. (CCH) ¶ 70,547, at 71,956. We are less sure than the district court that the market as defined in the complaint could not be a relevant market in these circumstances even if there may be other uses for MCM's equipment. *See, e.g., Fishman v. Estate of Wirtz*, 807 F.2d 520, 531–32 (7th Cir.1986) (defining the relevant market as that to which access had been sought and foreclosed by anticompetitive conduct even if the plaintiff may have had other business opportunities). Yet we need not definitively decide that question at this stage because there is nothing in the record to suggest that there in fact are other uses for MCM's equipment. The district court's willingness to look behind MCM's allegations because it believed MCM had not alleged facts to support the complaint's market definition is in considerable tension with our recent decision in *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778, 782 (7th Cir.1994). There, we explained that judicial attempts to apply a heightened pleading standard in antitrust cases had been "scotched" by the Supreme Court's decision in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* —— U.S. ——, ——, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993), and that after *Leatherman*, an antitrust plaintiff need not include "the particulars of his claim" to survive a motion to dismiss. 33 F.3d at 782. It is instead sufficient for the plaintiff to include in its complaint only "a short and plain statement of the claim" showing an entitlement to relief. Fed.R.Civ.P. 8(a)(2); *see Leatherman,* —— U.S. at ——, 113 S.Ct. at 1163; *Hammes,* 33 F.3d at 778. If a claim is stated against a

---

**10.** The court did not provide MCM with the opportunity to amend its complaint to attempt to allege facts supporting its market definition but dismissed the section 1 claim with prejudice.

municipality under 42 U.S.C. § 1983 when a plaintiff alleges only that the municipality maintained an official policy, custom, or practice and that an individual police officer acted in conformance with that official policy (*Leatherman*, —— U.S. at ——–——, 113 S.Ct. at 1162–63), then we fail to see how MCM's allegations in the instant case are insufficient to define the relevant market. *See Hammes*, 33 F.3d at 782. Moreover, it is not inconceivable to us that MCM could prove a set of facts supporting the relevant market definition alleged in its complaint. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). It was therefore erroneous for the district court also to dismiss MCM's section 1 claim on this ground.

Having rejected the alternative bases relied on by the district court for dismissing MCM's claim under section 1 of the Sherman Act, we reverse that dismissal and remand for further proceedings.

## B. RICO Claims

MCM also alleged claims for treble damages and injunctive relief under 18 U.S.C. §§ 1962(c) & (d), but the district court dismissed both claims pursuant to *Reves v. Ernst & Young*, —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). Because the only reasonable inference the court could draw from MCM's complaint was that A–B and FDC were victims of a scheme operated and managed by others, the court concluded that neither defendant had "conducted or participated in the conduct of a racketeering enterprise" under section 1962(c), or had joined a conspiracy to do so under section 1962(d). (R. 108, at 3.) MCM argues on appeal that its allegations were sufficient to establish defendants' participation in the operation or management of a racketeering enterprise under *Reves*. Even if they were not, however, MCM maintains that the district court erred in applying *Reves*, a section 1962(c) case, to its conspiracy claim under section 1962(d). We address each argument in turn.

### 1. Section 1962(c)

■ Section 1962(c) makes it unlawful for "any person employed by or associated with [an] enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). The question in *Reves* was whether an outside accounting firm could be liable under this provision for incorrectly valuing a farm cooperative's assets on the cooperative's financial statements. The Supreme Court held that it could not because the accounting firm had not "conduct[ed], or participated, directly or indirectly, in the conduct" of the cooperative's affairs. —— U.S. at ——–——, 113 S.Ct. at 1173–74. To be liable under section 1962(c), the Court held, it must be shown that the defendant "participated in the operation or management of the enterprise itself" (*id.* at ——, ——, 113 S.Ct. at 1172, 1173), and that requires that the defendant play "*some* part in directing the enterprise's affairs." *Id.* at ——, 113 S.Ct. at 1170 (emphasis in *Reves* ). At the same time, however, the Court refused to limit section 1962(c)'s reach to upper-level management, explaining that an enterprise also may be operated "by lower-rung participants ... who are under the direction of upper management." *Id.* at ——, 113 S.Ct. at 1173;[11] *see also LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 393–94 (7th Cir.1995); *United States v. Antar*, 53 F.3d 568, 580 (3d Cir.1995). Under *Reves*, therefore, a RICO enterprise may be operated at least by "upper management, 'lower-rung participants in the enterprise who are under the direction of upper management,' or 'others associated with the enterprise who exert control over it, as for example, by bribery.'" *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir.1994) (quoting *Reves*, —— U.S. at ——, 113 S.Ct. at 1173).

In the instant case, MCM defined the RICO enterprise as "an association-in-fact" comprised of OG, Boscarino, Hogan, the Teamsters, A–B, and FDC. (R. 94, at

---

11. The Court found it clear, however, "that Arthur Young was not acting under the direction of the Co-op's officers or board." *Id.* at —— n. 9, 113 S.Ct. at 1173 n. 9.

¶ 23.) [12] The enterprise's purpose, according to the complaint, was to make OG "the exclusive provider of forklift and material handling and personnel moving equipment for all exhibition contractors at McCormick Place." (*Id.* at ¶ 25.) All activities of A–B and FDC in relation to that enterprise are alleged to have been undertaken "at the direction of" one or more of the other members of the enterprise, and whenever A–B or FDC disobeyed such directions, it was "subject to discipline, including threats of strikes and damage to property." (*Id.* at ¶ 26.) The Taft–Hartley Act violations (the underlying predicate acts of racketeering) were therefore all undertaken by A–B and FDC at the direction of others. Indeed, MCM's counsel conceded at oral argument that his client has not alleged any conduct by these defendants that was not "directed by" OG, Boscarino, or Hogan. The district court determined on the basis of these allegations that neither defendant had played any part in directing the affairs of the enterprise under *Reves*, and it accordingly dismissed the claim.

MCM argues that the dismissal was erroneous because *Reves* itself observes that lower-rung participants under the direction of upper management may "operate" a racketeering enterprise. *See Reves*, —— U.S. at ——, 113 S.Ct. at 1173. Thus, even if Boscarino, Hogan, or perhaps OG may have managed the enterprise here, MCM maintains that both A–B and FDC still participated in the enterprise's operation by carrying out the directions given them. MCM's argument finds support in *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1161, 130 L.Ed.2d 1116 (1995), where the First Circuit

relied on *Reves*' statement about lower-rung participants to hold that a defendant may participate in the conduct of an enterprise "by knowingly implementing decisions, as well as by making them." [13] *Oreto* observed that:

> *Reves* is a case about the liability of *outsiders* who may assist the enterprise's affairs. Special care is required in translating *Reves*' concern with "horizontal" connections—focusing on the liability of an outside adviser—into the "vertical" question of how far RICO liability may extend within the enterprise but down the organizational ladder. In our view, the reason the accountants were not liable in *Reves* is that, while they were undeniably involved in the enterprise's decisions, they neither made those decisions nor carried them out; in other words, the accountants were outside the chain of command through which the enterprise's affairs were conducted.

*Id.* at 750 (emphasis in *Oreto*); *see also Reves*, —— U.S. at ——, 113 S.Ct. at 1173; *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 266 (3d Cir.1995). In our view, *Oreto* correctly reconciles the Supreme Court's holding in *Reves*—that a defendant must play some part in directing the enterprise's affairs—with its subsequent statement that "lower-rung participants . . . under the direction of upper management" may also "operate" the enterprise. *See Reves*, —— U.S. at ——, —— & n. 9, 113 S.Ct. at 1170, 1173 & n. 9; *see also* Daniel R. Fischel & Alan O. Sykes, *Civil RICO After Reves: An Economic Commentary*, 1993 Sup.Ct. Rev. 157, 192 (noting tension between "direction" requirement and statement about lower-rung participants and concluding that

---

**12.** An "enterprise" for RICO purposes may include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

**13.** *See also United States v. Starrett*, 55 F.3d 1525, 1548 (11th Cir.1995) ("we agree with the First Circuit that one may be liable under the operation or management test by 'knowingly implementing decisions, as well as by making them.' "); *United States v. Wong*, 40 F.3d 1347, 1373 (2d Cir.1994) ("*Reves* makes it clear that a defendant can act under the direction of superiors in a RICO enterprise and still 'participate' in

the operation of the enterprise within the meaning of § 1962(c)."), *cert. denied*, —— U.S. ——, 115 S.Ct. 2568, 132 L.Ed.2d 820 (1995); *cf. United States v. Viola*, 35 F.3d 37, 41 (2d Cir. 1994) ("Since *Reves*, it is plain that the simple taking of directions and performance of tasks that are 'necessary or helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)."); *University of Maryland v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1538–39 (3d Cir.1993) ("Under [*Reves*], not even action involving some degree of decisionmaking constitutes participation in the affairs of an enterprise.").

"the 'direction' requirement includes both those who direct, as well as those who take direction."). The question posed in the instant case, then, is whether A–B and FDC should be characterized as "outsiders," like the accounting firm in *Reves*, or as lower-rung participants who acted under the direction of the enterprise's upper management.

Although the question is not an easy one under the facts alleged here, we think these defendants are properly characterized as "lower-rung participants who are under the direction of upper management." *See Reves*, — U.S. at —, 113 S.Ct. at 1173. The primary fact leading us to this conclusion is the nature of the "enterprise" MCM has depicted, as both A–B and FDC are alleged to be members of an "association-in-fact" constituting the RICO enterprise. In *Reves*, by contrast, the plaintiffs maintained that the farm cooperative itself was the RICO enterprise, and the Court was then required to determine whether the accountants had conducted or participated in the conduct of *the cooperative's* affairs. *See Reves*, — U.S. at —, 113 S.Ct. at 1169. Under the theory advanced in *Reves*, the accounting firm was considered by the Court as an "outsider" to the enterprise, and the Court found that, as outsiders, the accountants had not participated in the operation or management of the cooperative. *Id.* at — – —, 113 S.Ct. at 1173–74. Here, however, it is difficult on the pleadings to characterize A–B and FDC as "outsiders" because they are alleged to be part of the enterprise itself. *Cf. Jaguar Cars*, 46 F.3d at 265–66 & n. 5; Fischel & Sykes, 1993 Sup.Ct.Rev. at 193–94. MCM also alleged that the predicate acts of racketeering were undertaken by these defendants "at the direction" of the enterprise's managers. *Cf. Reves*, — U.S. at — n. 9, 113 S.Ct. at 1173 n. 9. Moreover, these defendants were vital to the achievement of the enterprise's primary goal, as only they had the ability to exclude MCM from the market by dealing exclusively with OG. Thus, even if A–B and FDC may have been reluctant participants in a scheme devised by "upper management," they still knowingly implemented management's decisions, thereby enabling the enterprise to achieve its goals. In

our view, *Reves* would not bar a recovery against these defendants if the complaint's allegations were ultimately established after a trial. *See United States v. Wong*, 40 F.3d 1347, 1373–74 (2d Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 2568, 132 L.Ed.2d 820 (1995); *Oreto*, 37 F.3d at 750–51 (section 1962(c) applies to foot soldiers as well as to generals). We therefore reverse the dismissal of MCM's claim under section 1962(c) and remand for further proceedings.

### 2. Section 1962(d)

■ It should be plain from our discussion of MCM's section 1962(c) claim that MCM also has stated a claim against A–B and FDC for a conspiracy to violate that section. RICO's conspiracy provision makes it unlawful "for any person to conspire to violate" section 1962(a), (b), or (c). 18 U.S.C. § 1962(d). As we observed in *United States v. Quintanilla*, 2 F.3d 1469, 1484 (7th Cir. 1993), this conspiracy provision, "unlike [section] 1962(c), is not a substantive RICO offense; rather, [section] 1962(d) merely makes it illegal to conspire to violate any of the preceding sections of the statute." *See also United States v. Neapolitan*, 791 F.2d 489, 497 (7th Cir.), *cert. denied*, 479 U.S. 939, 940, 107 S.Ct. 421, 422, 93 L.Ed.2d 371, 372 (1986). Section 1962(d)'s target, then, is "the *agreement* to violate RICO's substantive provisions, not the actual violations themselves" (*Schiffels v. Kemper Fin. Servs., Inc.*, 978 F.2d 344, 348 (7th Cir.1992) (emphasis in *Schiffels*)), and liability under section 1962(d) is therefore "not coterminous with liability under [section] 1962(c)." *Quintanilla*, 2 F.3d at 1485. A defendant may conspire to violate section 1962(c) even if that defendant could not be characterized as an operator or manager of a RICO enterprise under *Reves*. *Quintanilla*, 2 F.3d at 1484–85; *see also United States v. Starrett*, 55 F.3d 1525, 1547 (11th Cir.1995); *United States v. Viola*, 35 F.3d 37, 43 (2d Cir.1994); *cf. Antar*, 53 F.3d at 581. As Quintanilla explains, "*Reves* addressed only the extent of conduct or participation necessary to violate a substantive provision of the statute; the holding in that case did not address the principles of con-

spiracy law undergirding [section] 1962(d)." 2 F.3d at 1485.

Our cases explain that a defendant may conspire to violate section 1962(c) if it agreed "to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity," and "it is only necessary that the defendant agree to the commission of [at least] two predicate acts on behalf of the conspiracy." *Neapolitan*, 791 F.2d at 498; *see also Quintanilla*, 2 F.3d at 1484; *United States v. Stern*, 858 F.2d 1241, 1246–47 (7th Cir.1988). The defendant need not have agreed to actually commit the predicate acts itself or even to participate in the commission of those acts so long as it agreed that the acts would be committed on behalf of the conspiracy. *Quintanilla*, 2 F.3d at 1484; *United States v. Campione*, 942 F.2d 429, 437 (7th Cir.1991); *United States v. Glecier*, 923 F.2d 496, 500 (7th Cir.), *cert. denied*, 502 U.S. 810, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991).

In the instant case, MCM alleged that A–B and FDC agreed to commit, on behalf of the enterprise, the Taft–Hartley Act violations comprising the pattern of racketeering activity. Defendants maintain, however, that this allegation must be read in conjunction with the remaining allegations in the complaint, which establish that they acted only at the direction of and in response to threats by OG, Boscarino, and Hogan. In essence, then, defendants advance the same argument here that we rejected under section 1 of the Sherman Act—that their actions were coerced and that a coerced party cannot be said to have joined an illegal conspiracy.

■ The argument is easily answered with respect to A–B, for the allegations in MCM's second amended complaint support the inference that A–B was able to extract work rule concessions from Hogan in return for its agreement to stop doing business with MCM. (*See* R. 94, at ¶ 39.) The complaint suggests, then, that A–B was not entirely a coerced party, but that it voluntarily agreed to participate in OG's scheme. Accepting those allegations as true, we may infer that A–B agreed to participate in the affairs of the alleged enterprise through a pattern of Taft–Hartley Act violations.

■ The question is potentially more difficult with respect to FDC, which apparently received nothing of value in return for dealing exclusively with OG at McCormick Place. Any illegal "agreement," then, may well have been thrust upon FDC by the threats and other pressure utilized by OG, Boscarino, and Hogan. We are reluctant to conclude, however, that the allegations in the complaint establish that FDC was coerced into violating the Taft–Hartley Act as a matter of law. *Cf. United States v. Sanders*, 962 F.2d 660, 676 (7th Cir.), *cert. denied*, —— U.S. ——, ——, ——, 113 S.Ct. 262, 284, 121 L.Ed.2d 192, 210 (1992). Economic coercion or duress is generally an affirmative defense to a conspiracy charge (*see United States v. Kopituk*, 690 F.2d 1289, 1315 (11th Cir.1982), *cert. denied*, 461 U.S. 928, 463 U.S. 1209, 103 S.Ct. 2089, 2090, 3542, 77 L.Ed.2d 300, 1391 (1983)), and that defense takes into consideration the types of pressure or coercion applied to the defendant and any alternatives to acquiescence that may have been available. *See Sanders*, 962 F.2d at 674 n. 16, 676 (approving coercion instruction in RICO conspiracy case which explained that a defendant was "coerced" if he "committed the offense charged only because he reasonably feared that immediate, serious bodily harm or death would be inflicted upon him if he did not commit the offense, and he had no reasonable opportunity to avoid the injury."); *see also United States v. Bailey*, 444 U.S. 394, 410–11, 100 S.Ct. 624, 634–35, 62 L.Ed.2d 575 (1980); *United States v. Crowder*, 36 F.3d 691, 696 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1146, 130 L.Ed.2d 1105 (1995); *United States v. Logan*, 49 F.3d 352, 359 (8th Cir.1995); *United States v. Stevens*, 985 F.2d 1175, 1181 (2d Cir.1993); *United States v. Karr*, 742 F.2d 493, 497 (9th Cir.1984); *cf. United States v. Haversat*, 22 F.3d 790, 796 (8th Cir.1994) (coercive economic influence of one conspirator does not provide basis for downward departure to sentences of other conspirators under the Sentencing Guidelines). Although MCM's allegations indicate that some economic pressure was applied and that threats of violence were made, the complaint does not establish that FDC lacked a reasonable opportunity to avoid the threatened conse-

quences in some other way. Thus, although one or both defendants may ultimately succeed in asserting a coercion defense, they do not do so on the basis of the allegations in MCM's complaint alone.

FDC alternatively argues that MCM failed to allege the existence of a RICO enterprise or of a pattern of racketeering activity.[14] The district court did not address these issues in dismissing MCM's RICO claims, but we of course may affirm the dismissal on any ground finding support in the record. *Indemnified Capital Inv., SA v. R.J. O'Brien & Assoc., Inc.*, 12 F.3d 1406, 1410 (7th Cir. 1993). We think it more efficient here, however, to leave those additional matters to the district court in the first instance, as the resolution of those issues in defendants' favor would not obviate the need for a remand. *See supra*, at 977 (remanding Sherman Act claim).

### III. CONCLUSION

For the foregoing reasons, we vacate the dismissal of MCM's claims under section 1 of the Sherman Act and sections 1962(c) & (d) of the RICO statute and remand to the district court for further proceedings consistent with this opinion.

VACATED AND REMANDED.

---

14. A–B has not advanced similar arguments in this appeal.