**EMCORE CORPORATION, Plaintiff,**

v.

**PRICEWATERHOUSECOOPERS LLP, Norman Adams, Sheridan Biggs, Jr., Edward Cameron, William Driscoll, Jr., J. Michael Farrell, James Kovacs, Lennart Lindegren, Roland Maas, James Schiro and Walter Ricciardi, Defendants.**

No. CIV. A. 99–5401.
Civil Action No. 99–5401.

United States District Court,
D. New Jersey.

July 6, 2000.

Stephen Greenberg, Stern & Greenberg, Roseland, NJ, Marc Kasowitz, Jonathan Minsker & Harold Levinson Kasowitz, Benson, Torres & Friedman LLP Newark, NJ, for Plaintiff Emcore.

William Reilly, McCarter & English, LLP, Newark, NJ, Francis Barron, Amy Candido, Julie North, Cravath, Swaine & Moore, New York City, for Defendants.

## OPINION

WALLS, District Judge.

### INTRODUCTION

Plaintiff Emcore Corporation, a publicly-held corporation based in Somerset, New Jersey, designs and manufactures compound semiconductor wafers and devices used in the production of electronic goods. This action arises, according to plaintiff, out of the concerted illegal actions taken by defendants PricewaterhouseCoopers LLP ("PWC"), certain PWC partners, and PWC's in-house counsel Walter Ricciardi.

The core of plaintiff's charges is that PWC performed auditing services for Emcore while PWC partners owned Emcore stock, in violation of federal and state regulations mandating that auditors be independent of their clients. Emcore alleges that defendants concealed such violations and misrepresented the nature and extent of an investigation into PWC's business practices by the Securities Exchange Commission ("SEC"). Plaintiff's amended complaint asserts counts against all defendants under the federal RICO statute, 18 U.S.C. § 1962(c) (Counts I and II), New Jersey state RICO, N.J.S.A. § 2C:41–2(c) (Count IV), federal and state RICO conspiracy (Counts III and V), as well as state law claims for fraud, negligent misrepresentation, the New Jersey Consumer Fraud Act, breach of fiduciary duty, malpractice, and breach of contract (Counts VI—XI).

Briefly, the parties' history together is as follows: In 1984, Emcore formed as a limited partnership, and the defendant PWC partners purchased interests in it. And in 1986, when Emcore became a corporation, the PWC partners converted their limited partnerships into Emcore stock and warrants. Also in that year, Emcore retained Coopers & Lybrand ("Coopers") to audit its 1986 fiscal year financial statements. Coopers served as Emcore's auditor each fiscal year from 1986 through 1997. Emcore asserts that it chose not to retain Price Waterhouse as its initial auditors because Price Waterhouse, through its partners' investments in Emcore, was not independent.

In July 1998, Price Waterhouse and Coopers merged to form Pricewaterhouse-Coopers. Soon after, PWC began its audit of Emcore's 1998 fiscal year financial statements, which plaintiff claims was crucial to its plan to conduct a secondary public offering in early 1999. Emcore planned to use the capital thus raised to fund a joint venture with General Electric.

On January 14, 1999, unknown to Emcore, the SEC entered a Settlement Order against PWC which recited that the firm (and its predecessor Coopers) had repeatedly violated applicable auditor independence regulations. What happened next is disputed.

Emcore charges that the defendants belatedly disclosed the independence violations on January 29, 1999. PWC partner Brendan Dougher informed Emcore's CEO Tom Werthan on February 1, 1999— the day before Emcore was to file its Form S–3 Registration Statement with the SEC—that PWC would not sign its consent for Emcore to incorporate past audit opinions (the "consent") into the SEC filing until all partners had disposed of their Emcore holdings. Am. Compl. ¶ 54. Even then, plaintiff claims, defendants continued their pattern of concealment by misrepresenting facts about the SEC investigation and assuring Emcore that its upcoming public offering would not be further delayed. *Id.* ¶ 55. Further, despite defendants' representations that PWC partners had fully divested their Emcore stock by February 3 or 4, 1999, some PWC partners owned Emcore shares as late as mid-March of that year. *Id.* ¶ 75. By the time Emcore saw the full picture, the SEC announced in May that Emcore would have to re-audit its 1998 financial statements, and Emcore retained Deloitte & Touche LLP to do so, plaintiff's public offering had been delayed to June 1999.

On the other hand, the PWC defendants claim that as soon as they became aware of the compliance issues, they advised Emcore of the need to disclose the violations to the SEC and promptly disposed of their Emcore holdings. PWC Br. at 2. On February 4, 1999, PWC signed the consent and Emcore filed with the SEC immediately afterward. Defendants concede that SEC clearance process was delayed, but insist that the delay was partly because the Commission had other substantive concerns about Emcore, and that they never predicted whether a re-audit would be required. In short, defendants argue that they acted promptly to correct any regula-

tory violations, committed no fraud, and cannot be held responsible for the delay in Emcore's public offering.

On June 11, 1999, Emcore consummated its public offering of 3,897,441 shares of common stock at a price of $19.00 per share.

Defendants now move to dismiss the amended complaint pursuant to Fed. R.Civ.P. 12(b)(6) and 9(b). The court heard oral argument on June 26, 2000.

## DISCUSSION

### I. Standard for Motion to Dismiss

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3rd Cir.1994). The question is whether the plaintiff can prove any set of facts consistent with its allegations that will entitle it to relief, not whether it will ultimately prevail. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). While a court will accept well-plead allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegation. *See Miree v. DeKalb County, Ga.*,

433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977). Moreover, the plaintiff must set forth sufficient information to outline the elements of its claims or to permit inferences to be drawn that these elements exist. *See* Fed.R.Civ.P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### II. RICO Standing

Emcore alleges that it suffered two distinct types of injury as a direct result of defendants' RICO violations: 1) it paid PWC for an audit "which ultimately was worthless" and was forced to retain and pay Deloitte & Touche to re-audit its 1998 financial statements and 2) its public offering was delayed, which damaged its relationships with its business venture partners, including General Electric, lenders, vendors and underwriters. Am. Compl. ¶¶ 46, 104.[1]

Defendants initially raise a standing argument: they argue that because their alleged acts did not proximately cause Emcore's injuries, the federal and state RICO claims should be dismissed.

■ A civil RICO plaintiff "only has standing if, and can only recover to the extent that, [it] has been injured in [its] business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Under Supreme Court precedent, simple "but

---

1. In its amended complaint, Emcore also recites that on February 1, 1999, the day before it had originally planned to file its registration statement with the SEC, its common stock traded at a high of $24.25 per share and closed at $22.50. *Id.* ¶ 56. However, by the time Emcore consummated its public offering, on June 11, 1999, it received only $19.00 per share. *Id.* ¶ 78. Defendants comment, "Emcore appears to be suggesting that, if it weren't for the delay, it would have sold ... shares at $24 per share in February 1999, rather than the $19 per share that it received when its public offering went effective in June 1999. However, there is no basis for Emcore's suggestion that, but for PW's actions, the company could have sold shares for $24

in February. There was *no* date between February 4, 1999 ... and June 11, 1999 ... on which Emcore stock sold at a price even approaching $24.... Moreover, the law of supply and demand dictates that a large public offering almost always gets sold at a price lower than the price prevailing in the unaffected market at the time of the offering." PWC Br. at 9 n. 6.

Evidently, the loss in Emcore's value presents complex valuation issues. For the time being, the court concludes that the causation and amount of the alleged stock devaluation, as part of plaintiff's generalized "business loss," should appropriately be decided as an aspect of plaintiff's proof of damages.

for" causation does not establish RICO standing. *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 267, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Instead, a RICO plaintiff must show that defendants' acts proximately caused its injuries. *Id.* The *Holmes* Court recognized that this inquiry, analogous to that into antitrust standing, is a prudential one:

> [W]e use "proximate cause" to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At bottom, the notion of proximate cause reflects "ideas of what justice demands, or of what is administratively possible and convenient."

*Id.* at 268–69, 112 S.Ct. 1311 (citations omitted). Fortunately, the Court then explained three concerns which guide the standing determination:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Id.* at 269–70, 112 S.Ct. 1311 (citing, *inter alia, Assoc. Gen. Contractors,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). This analysis applies to both federal and New Jersey RICO claims. *See, e.g., Callahan v. A.E.V., Inc.,* 182 F.3d 237, 260 (3rd Cir.1999) (federal RICO); *Interchange*

*State Bank v. Veglia,* 286 N.J.Super. 164, 668 A.2d 465, 472 (1995) (state RICO).

The Third Circuit has recently decided several illustrative cases. In *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912 (3rd Cir.1999), plaintiff union health and welfare funds sued tobacco companies and industry organizations, alleging that the defendants were liable for the funds' costs to treat their participants' smoking-related illnesses. The Circuit Court rejected plaintiffs' theory, reasoning: "[I]f the Funds are allowed to sue, the court would need to determine the extent to which their increased costs for smoking-related illnesses resulted from the tobacco companies' conspiracy to suppress health and safety information, as opposed to smokers' other health problems, smokers' independent ... decisions to smoke, smokers' ignoring of health and safety warnings.... [T]his causation chain is much too speculative and attenuated to support a RICO claim." *Id.* at 933.

Likewise, the Third Circuit denied standing to plaintiffs in *Callahan v. A.E.V., Inc.,* 182 F.3d 237, 260 (3rd Cir.1999). There plaintiff "mom and pop" beer distributorships alleged that their supermarket-style competitor, "Beer World," had undercut their prices and injured their businesses by operating more than one distributorship in violation of the Pennsylvania Liquor Code. Apparently, the owner of Beer World had misrepresented his ownership of a chain of stores by filing false affidavits with the Pennsylvania Liquor Control Board (LCB). *See id.* at 240. The Circuit Court concluded that the LCB and the Commonwealth of Pennsylvania were the "direct victims" of the defendants' actions and that the plaintiffs' losses were "at most derivative" of the governmental injuries. *Id.* at 261.

Defendants analogize the present case to those precedents, arguing that the SEC's intervening actions and plaintiff's own shortcomings preclude liability. They first submit that Emcore's public offering was

contingent on the SEC's clearance of its registration statement and that the SEC's independent decision to strictly enforce its rules and require a re-audit broke the chain of causation. Next, the defendants claim that the re-audit did not cause the postponement, "because the clearance was delayed in any event by the SEC's review of other issues relating to Emcore." PWC Br. at 10 n. 7. And finally, they allege that, though the SEC finally approved Emcore's application in May 1999, Emcore did not proceed with its public offering until the following month. *Id.*

■ The defendants' analysis cannot now overcome the allegations of the amended complaint. Emcore alleges that defendants' disclosure of independence violations, coupled with their refusal to consent to incorporation of past audit opinions, pushed the SEC filing date from February 2 to February 4, 1999. More significantly, the SEC determined during its clearance process that PWC's audit was deficient because of the independence violations, and required Emcore to obtain re-audited financial statements for 1998, by another auditor. *Id.* ¶ 76. Emcore was not able finally to amend its registration statement until June 9, 1999. *Id.* ¶ 78. This narrative leads to the conclusion that Emcore has standing to bring its RICO claims.

Focusing on the causal link between defendants' alleged racketeering acts and plaintiff's injuries, *see Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162 (3rd Cir.1989), *overruled on other grounds, Beck v. Prupis,* —— U.S. ——, ——, 120 S.Ct. 1608, 1613, 146 L.Ed.2d 561 (2000), the court reads the complaint to allege that Emcore would earlier have been able to secure a re-audit absent defendants' acts of misrepresentation and concealment. In short, the court can, and must on a motion to dismiss, infer that the defendants' actions postponed Emcore's public

offering. *See* Am. Compl. ¶ 67. (Of course, on a motion to dismiss, the court can and does not credit the defendants' vague assertion that the SEC had other nonaudit-related concerns about Emcore which delayed the clearance process.) PWC Br. at 10 n. 7. Here, Emcore's alleged injuries were not derivative, but direct. *See Spitzer v. Abdelhak,* No. 98–6475, 1999 WL 1204352 (E.D.Pa. Dec.15, 1999); *cf. Callahan,* 182 F.3d at 262 n. 16.

Additionally, defendants do not dispute the link between their alleged actions, Emcore's economic injury in paying for a useless audit, and Emcore's need to pay another accounting firm to redo PWC's work. Plaintiff's audit expenses were an obvious direct injury and provide an alternate basis for this holding.

The defendants' motion to dismiss Emcore's federal and state RICO claims for lack of standing is denied.

### III. Pleading Predicate Acts

To plead a violation of 18 U.S.C. § 1962(c), Emcore must allege: 1) the conduct 2) of an enterprise 3) through a pattern 4) of racketeering activity. *Sedima,* 473 U.S. at 496, 105 S.Ct. 3275 (quoted in *Rehkop v. Berwick Healthcare Corp.,* 95 F.3d 285, 289 (3rd Cir.1996)). Defendants seek to dismiss Emcore's substantive federal and state RICO claims (Counts I, II and IV) because plaintiff failed to plead each defendant's participation in at least two "predicate acts" of racketeering activity.[2] *See Banks v. Wolk,* 918 F.2d 418, 421 (3rd Cir.1990); *State v. Ball,* 141 N.J. 142, 163, 661 A.2d 251 (N.J.1995). They claim first that Emcore has fallen short, both substantively and under Fed.R.Civ.P. 9(b), of identifying actionable predicate offenses. Further, defendants argue that plaintiff failed to attribute specified fraudulent acts to each named defendant, but has instead impermissibly "lumped them

---

**2.** The statute defines a "pattern" as "at least two acts of racketeering activity" within ten years of each other. 18 U.S.C. §§ 1964,

1961(5). The pattern element is discussed in detail in Section IV below.

together." In response, Emcore relies on the federal doctrine of notice pleading, *see* Fed.R.Civ.P. 8, and the fulsome allegations of the amended complaint.

■ Plaintiff grounds the challenged counts in allegations of federal mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. These violations constitute predicate offenses under federal RICO, 18 U.S.C. § 1961(1), and the state law, N.J.S.A. 2C:41–1(2) (incorporating by reference federal list of racketeering activities). To allege mail or wire fraud, plaintiff must describe: 1) the existence of a scheme to defraud, 2) the use of the mails or wires in furtherance of the fraudulent scheme,[3] and 3) culpable participation by the defendants. *See U.S. v. Pearlstein*, 576 F.2d 531, 534 (3rd Cir.1978); *U.S. v. Hannigan*, 27 F.3d 890, 892 (3rd Cir.1994); *see also United States v. Frey*, 42 F.3d 795, 797 (3rd Cir.1994) (noting parallelism between mail and wire fraud statutes).

■ "To be part of the execution of [mail] fraud ... the use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be 'incident to an essential part of the scheme,' or 'a step in [the] plot.'" *Schmuck v. United States*, 489 U.S. 705, 710–11, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) (citations omitted). Further, the Third Circuit notes that even "completely 'innocent' mailings" (those that contain no false information) can satisfy the mailing element. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3rd Cir.1991) (quoting *Schmuck v. United States*, 489 U.S. 705, 715, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)); *see also Tabas v. Tabas*, 47 F.3d 1280, 1295 n. 18 (3rd Cir.1995). Thus, "[a] scheme or artifice to defraud 'need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to de-

ceive persons of ordinary prudence and comprehension.'" *Kehr Packages*, 926 F.2d at 1415 (quoting *Pearlstein*, 576 F.2d at 535).

The amended complaint contains, *inter alia*, the following allegations:

A. Defendant PWC Partners [4]

● Professional accounting standards as expressed by SEC regulations, the New Jersey Administrative Code, the American Institute of Certified Public Accountants ("AICPA") and Generally Accepted Accounting Standards ("GAAS") mandate that accountants be "independent in the performance of professional services." "According to the AICPA, an accounting firm is not independent if, during the period of a professional engagement or at the time of expressing an opinion, a member of the accounting firm has any direct or material indirect financial indirect interest in the client." ¶¶ 23, 25–27.

● In early December 1997 after the Price Waterhouse/Coopers & Lybrand merger was announced, Emcore's Chief Financial Officer Tom Werthan telephoned Coopers audit partner Brendan Dougher to verify that PWC could continue to act as Emcore's independent auditors after the merger. Dougher claimed that all Price Waterhouse partners owning Emcore stock would divest their Emcore holdings before the merger, that both Coopers and Price Waterhouse were "taking all steps necessary to ensure PWC's independence," and that PWC would in fact be independent with respect to Emcore. ¶ 30.

● Defendant PWC partners including Cameron, Driscoll, Farrell and Lindegren exercised warrants to purchase additional Emcore stock at approximately $4 per share (significantly below market prices) both before and after announce-

---

**3.** While wholly intrastate use of the mails satisfies this element of mail fraud, the federal wire fraud statute requires interstate use of the wire. *See, e.g., Annulli v. Panikkar*, 200 F.3d 189, 200 (3rd Cir.1999).

**4.** Note that Emcore names as defendants only 9 PWC partners out of a pool of approximately 2,700.

ment of the merger, and as late as January 1998. ¶¶ 28–33, 45. In January 1998, PWC partner Farrell telephoned Werthan to discuss his ownership of Emcore stock. He suggested that Emcore should "do something" to "make whole" the Price Waterhouse partners who were required to dispose of their holdings in Emcore, and would thus recognize taxable gains. ¶ 33. Farrell did not dispose of his shares after that conversation, but instead exercised 8,000 warrants to purchase more Emcore stock on January 30, 1998. *Id.* Werthan received "similar phone calls" from other, unspecified PWC partners until he informed Dougher that such calls were not appropriate. ¶ 34.

● On July 1, 1998, the day the merger was consummated, "some or all of the PWC Partners" owned an aggregate 140,000 shares of Emcore common stock. ¶¶ 36–37.

● In September 1998, soon after PWC began its audit of Emcore's 1998 financial statements, Dougher responded to another phone call from Werthan by repeating his representation that PWC was in compliance with applicable independence regulations. ¶¶ 38, 40, 44. However, plaintiff alleges, defendant PWC partners including Schiro, Adams, Biggs, Cameron, Driscoll, Farrell, Kovacs, Lindegren and Maas still held Emcore stock during this period. ¶ 41.

● And on January 8, 1999, Dougher attended an "all hands" organizational meeting of Emcore to prepare for the planned February 2 SEC filing. He did not then disclose that PWC's 1998 audit had violated independence rules. ¶ 47.

● On January 29, 1999, Dougher informed Werthan by phone that PWC had not been independent during its 1998 audit of Emcore, and that certain PWC part-

ners continued to hold Emcore stock to the present date. ¶ 53.

● On February 4, 1999, Dougher phoned Emcore's outside counsel to inform her that all of the PWC partners had finally disposed of their Emcore stock. ¶ 59. On February 8, Dougher mailed a letter to Emcore's Audit Committee which represented that the PWC partners had disposed of their Emcore holdings "on or before February 3, 1999." ¶ 61. Plaintiff alleges that, though many PWC partners sold their Emcore holdings between February 2–4, 1999, *see* ¶¶ 56–58, defendants Lindegren and Maas did not divest their Emcore stock until mid-March 1999. ¶ 75.

● The SEC's Settlement Order of January 14, 1999 reported the Commission's findings that PWC had repeatedly violated the independence rules of SEC regulations and GAAS. Am. Compl. Exh. A. The SEC required PWC to perform an internal investigation of all independence violations, supervised by an independent firm, and to report any additional violations to the Commission and the audit client involved. ¶ 80.

● In response, PWC partners self-reported over 8,000 independence violations, involving approximately 600 clients. Almost half of PWC's partners reported at least one such violation. ¶ 85. However, despite a warning from the SEC that criminal penalties might result from false reporting, the SEC found that 77.5% of PWC partners selected during a random sample failed to report at least one independence violation. ¶¶ 81, 87.

● In September 1998, when PWC began the Emcore audit, Emcore common stock was priced at $7.00 per share. ¶ 42. By early February 1999, when most partners divested their holdings, Emcore was trading at a high of $24.25 per share. ¶¶ 56–58.[5]

---

**5.** Emcore alleges in its brief that by retaining their holdings until February 1999, many PWC partners recognized an approximate 500% gain on their investment. It adds that

if the partners had sold their shares when the Emcore audit began in September 1998, they would have realized only 180% return. Emcore Br. at 25. The court is unable to con-

■ The PWC partners characterize these allegations as insufficient under Fed. R.Civ.P. 12(b)(6): "Purchasing, owning or selling Emcore stock ... does not constitute mail or wire fraud." PWC Br. at 12. Further, they contend that the telephone calls to Werthan by Farrell and other unnamed partners allegedly suggesting that Emcore "make them whole" did not involve misrepresentations, and thus are not legally cognizable. PWC Br. at 12–13.

The court disagrees. Though the plaintiff has not alleged that the PWC partners personally and affirmatively misrepresented their ownership of Emcore stock, Emcore's allegations about the extent, timing and profitability of these defendants' holdings, and Dougher's repeated inaccurate assurances to the contrary, raise the inference that either the defendant partners or PWC itself chose to actively conceal material facts. This inference is strengthened by plaintiff's allegations that, according to the SEC, many PWC partners failed to report accurately their holdings despite the threat of criminal sanctions. The court finds it appropriate to allow plaintiff discovery on the issue of the partners' knowledge of and involvement in these nondisclosures. Concerning the phone conversations between the partners and Werthan, the court repeats that even "innocent" use of the wires can base an actionable fraud claim; plaintiff need allege only that the interstate phone calls were "a step in [the] plot." *Kehr Packages,* 926 F.2d at 1415; *Schmuck,* 489 U.S. at 710–11, 109 S.Ct. 1443. Here Emcore persuasively argues that the partners could not have continued to misrepresent their independence, and buy and sell shares of Emcore, without use of the interstate wires and mails. Emcore Br. at 37.

The PWC partners' motion to dismiss for failure to allege predicate acts is denied.

firm these exact figures from the allegations of the complaint, but the general trajectory of

## B. The PWC Partnership

Emcore makes the following charges against PWC, most of which concern PWC partner Dougher and outside counsel Robert McCaw of Wilmer Cutler & Pickering in Washington, D.C.:

● In October 1998, Dougher mailed or caused to be mailed to Emcore an engagement letter relating to the 1998 audit, by which PWC agreed to perform its audit "in accordance with generally accepted auditing standards." ¶ 43. In December 1998, after the audit had been completed, PWC signed and mailed to Emcore its audit letter, which purportedly enclosed a "report of independent accountants" for an audit conducted "in accordance with generally accepted accounting standards." ¶ 45.

● In response to direct inquiries by Werthan, Dougher repeatedly represented that PWC would serve, and had served, as an independent auditor, and that the partnership would take all steps necessary to ensure independence. ¶¶ 30, 34, 40. Yet, "Dougher was well aware of the investments the PWC Partners had made in Emcore over the years." ¶ 30.

● In early December 1997, soon after the merger announcement, PWC partner Cameron requested and received by fax from Emcore a list of Price Waterhouse partners who had invested in Emcore as limited partners in 1984. ¶¶ 19, 31. In January 1999, after the SEC Settlement Order was entered, PWC partner Dougher again requested and received from Werthan the same list by fax. ¶ 53.

● As said, on February 4, 1999 by phone and February 8 by letter, Dougher informed Emcore's counsel and Audit Committee that all of the PWC partners had disposed of their Emcore stock on or before February 3, 1999. ¶¶ 59, 61.

● Dougher conducted other actions on behalf of PWC that are described above: In January 1999, he attended an Em-

Emcore's stock prices during this period is unmistakable.

core meeting to plan for the upcoming public offering but failed to disclose independence violations. ¶ 47. And in February of that year, he repeatedly represented to plaintiff by letter and in person that the SEC would waive PWC's non-compliance with respect to Emcore—and that the SEC had so indicated to PWC. ¶¶ 63–65.

● On March 4, 1999, McCaw told Emcore's outside counsel during a phone conversation that the SEC viewed the independence violations as an "enforcement issue," not an "issuer re-audit issue": in other words, that the SEC was considering how to punish PWC, not Emcore. ¶ 66.

● On March 15, 1999, PWC's in-house counsel Ricciardi and McCaw by phone informed Dougher and Emcore's outside counsel that PWC had scheduled a meeting with the SEC for the next day. Ricciardi and McCaw explained that the meeting was merely an "enforcement meeting" relating to the SEC Settlement Order, and that it did not directly concern Emcore. When Emcore's counsel asked to attend the meeting, Ricciardi and McCaw rejected the request as "unprofessional" and threatened to resign as Emcore's auditors if Emcore insisted on attending. ¶ 71.

● During its own meeting with the SEC on March 19, 1999, Emcore was informed that the SEC's March 16 meeting with PWC had concerned Emcore exclusively. Further, the SEC told Emcore that it would not waive, "and had never indicated to PWC that it would waive," PWC's non-compliance with the independence rules in Emcore's case. ¶ 74.

● Emcore fired PWC in May 1999. On June 8, 1999, the day before Emcore planned to file the last amendment to its registration statement, PWC through Dougher demanded that Emcore release PWC from all liability related to the 1998 audit, and told Werthan that without such release, PWC would not sign

its consent for Emcore to incorporate PWC's 1996 and 1997 financial statements into the registration statement. Emcore objected through counsel; PWC withdrew the threat that same day. ¶ 77. Again in December 1999, PWC refused to consent to incorporation of Coopers' 1997 financial statements into Emcore's 1999 Form 10–K, allegedly in an attempt to force Emcore to dismiss the present lawsuit. As a result, Emcore was forced to have its 1997 financial statements re-audited by Deloitte. ¶¶ 91–92.

■ PWC objects that plaintiff has not alleged that Dougher or McCaw had knowledge that any of the alleged misrepresentations was false or possessed the requisite intent to deceive Emcore. PWC Br. at 16. Arguing that its many statements simply became inaccurate after the fact, PWC relies on authority that "fraudulent intent to breach a promise cannot be inferred merely from nonperformance." *W.E. Darin Constr. Enterprises, Inc. v. Detroit Coke Co.*, 814 F.Supp. 325, 330 (W.D.N.Y.1993). Yet the cases advanced by defendants are readily distinguished. The *Darin* court reviewed allegations that a manufacturer had promised to pay a contractor to construct a building, but had failed to make any payments. The court refused to infer, based solely on purchase orders and promises of payment, that the defendant had known before entering the contract that no funding was available for the project. *Id.* at 330–31. *Cf. also Langley v. American Bank of Wisconsin*, 738 F.Supp. 1232 (E.D.Wis.1990) (refusing to allow RICO fraud claims based on defendants' statements of opinion and "puffing" that business for sale included a "good grade A dairy farm" and a "good healthy herd of cows," and that there was a "high demand for milk in the area").

In contrast, this court concludes that Emcore has "averred generally" fraudulent intent by PWC's agents, within the standards of Fed.R.Civ.P. 9(b). Am. Compl. ¶ 30, 97; *Seville Indus. Mach.*

*Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3rd Cir.1984) (Rule 9(b) satisfied where plaintiff described "the nature and subject of the alleged misrepresentation," though plaintiff had not plead the date, place or time of alleged fraud; emphasizing that purpose of rule is to require notice pleading only). And the plaintiff has plead facts that support the inference of such intent. There was nothing equivocal about Dougher's spoken and written representations that the PWC partners would divest their Emcore holdings as required by professional standards and the SEC and could provide independent audit services. *Cf. Langley,* 738 F.Supp. at 1232. Further, at the time Dougher represented (allegedly falsely) to Emcore in February 1999 that all partners had complied with the regulations, PWC was then under SEC scrutiny and had twice requested and received Emcore's own list of PWC partners who were potentially in violation of the rules. Finally, the plaintiff has plead that the SEC found evidence of widespread falsity in PWC's reporting; that PWC tried to coerce Emcore to drop the present lawsuit; and that the partnership had a strong financial interest in retaining Emcore as a client and maintaining its professional reputation.

Emcore's allegations give rise to an inference of fraud and fairly notice the PWC partnership of the charges against it. The motion by the PWC partnership to dismiss for failure to allege predicate acts is denied.

### C. PWC's In–House Counsel Walter Ricciardi

● On February 1, 1999, Ricciardi phoned Emcore's outside counsel to disclose to Emcore for the first time the existence of the January 14 SEC Settlement Order. Ricciardi represented that: PWC had 180 days to comply with the terms of the Settlement Order; any independence issues related to Emcore's audit were covered by the Settlement Order such that the audit would remain valid; and PWC's lack of independence would not further delay Emcore's public offering. Ricciardi also represented to plaintiff that the SEC had indicated to PWC that it would not require Emcore to obtain a re-audit. ¶ 55. As noted, plaintiff claims that each of these representations was false. ¶ 74.

● On February 11, February 24 and March 9, 1999, during a face-to-face meeting with Emcore's Audit Committee and phone calls with Emcore's outside counsel, Ricciardi again represented that the SEC had indicated to PWC that it would excuse PWC's "technical violations" of the independence rules if none of the culpable partners had worked on Emcore's 1998 audit. ¶¶ 64, 65, 68.

● Ricciardi joined Dougher's representations to Emcore that PWC's March 16, 1999 meeting with the SEC did not directly concern Emcore. ¶ 71.

Ricciardi likewise contests plaintiff's allegations by claiming that, though his statements concerning the SEC's intentions were eventually proved false, he should not be held liable for inadvertent inaccuracies. This argument might be persuasive if plaintiff merely referred to Ricciardi's legal opinions. However, Emcore has alleged that Ricciardi made a number of specific statements, including a direct representation that "the SEC had indicated [to PWC] that it would not require a re-audit." ¶ 68. The SEC denies ever giving such indication. ¶ 74. Emcore should have the opportunity to take discovery of Ricciardi about his state of mind while making this and other alleged representations. Ricciardi's motion to dismiss is therefore denied.

In closing, the court rejects the defendants' argument that plaintiff has impermissibly grouped them together in violation of Fed.R.Civ.P. 9(b). The Third Circuit cautions that Rule 9(b) should not be applied so strictly as to cancel out the "general simplicity and flexibility contemplated by the [Federal Rules of Civil Procedure]." *Craftmatic Sec. Litig.*

**250**

*v. Kraftsow,* 890 F.2d 628, 645 (3rd Cir. 1989). Emcore has plead the date, place, speakers and content of the alleged misrepresentations; such is sufficient at this stage to allow the defendants to prepare their strategy. *Seville,* 742 F.2d at 791; *Christidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96, 100 (3rd Cir.1983) ("focusing exclusively on [the] 'particularity' language [of Rule 9(b)] 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'" (quoting Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1298 (1st ed.1969))); *cf. Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658–59 (3rd Cir. 1998) (dismissing complaint under Rule 9(b) where plaintiffs described the content of allegedly fraudulent mailings but failed to specify "when, by whom, and to whom [each] mailing was sent, and the precise content of each particular mailing"); *Saporito v. Combustion Engineering Inc.,* 843 F.2d 666, 676 (3rd Cir.1988) (plaintiffs failed to identify speakers and recipients of allegedly fraudulent statements).

## IV. Pattern of Racketeering Activity

In 1989, the Supreme Court concluded that to satisfy the "pattern" element, a civil plaintiff must plead both that defendants' predicate acts were related and that they "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 238, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The Court relied on the congressional definition of relatedness found alongside RICO in the Organized Crime Control Act of 1970: "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. 2893. Concerning continuity, Justice Brennan declined to formulate a

test in the abstract, but wrote: "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept." *Id.* at 241, 109 S.Ct. 2893 (citing *Barticheck v. Fidelity Union Bank/First National State,* 832 F.2d 36, 39 (3rd Cir.1987)). The *H.J.* Court also held, resolving a split among the Circuits, that proof of multiple schemes is unnecessary to demonstrate a RICO pattern. *Id.* at 240–41, 109 S.Ct. 2893.

Before the *H.J.* decision, the Third Circuit had provided a list of factors to use to determine the existence of a "pattern": 1) the number of unlawful acts; 2) the length of time over which the acts were committed; 3) the similarity of the acts; 4) the number of victims; 5) the number of perpetrators; and 6) the character of the unlawful activity. *Barticheck v. Fidelity Union Bank/First National State,* 832 F.2d 36, 39 (3rd Cir.1987). After *H.J.,* the Third Circuit instructs that these additional *Barticheck* factors be considered "where relatedness and continuity are in doubt." *Tabas v. Tabas,* 47 F.3d 1280, 1296 and n. 21 (3rd Cir.1995).

Plaintiff's burden on this Rule 12(b)(6) motion to dismiss is low. Our Circuit Court, noting that the *H.J.* opinion had reversed a district court's grant of dismissal where "a threat of continuity of racketeering activity might be established at trial," 492 U.S. at 250, 109 S.Ct. 2893, explains that "in many cases plaintiffs will be able to withstand a facial attack on the complaint and have the opportunity to have their pattern allegations threshed out in discovery." *Swistock v. Jones,* 884 F.2d 755, 758 (3rd Cir.1989) (citing *Seville,* 742 F.2d at 790, which adopted a generous standard of review of RICO "enterprise" allegations at motion to dismiss stage).

That said, the court examines defendant's motion to dismiss Counts I and II of

the amended complaint (federal RICO), as well as Count IV (New Jersey RICO), for failure to meet the pattern requirement.

### A. Relatedness

Defendants first object that plaintiff cannot rely on allegations that other PWC clients were harmed. *See, e.g.*, Am. Compl. ¶ 100 ("[U]pon information and belief ... PWC and some of the other PWC partners [mailed and received] certain mail matter that contained false representations to some of PWC's other clients, including, but not limited to, audit engagement letters and audit letters knowingly misrepresenting PWC to be independent."). Initially, defendants claim that plaintiff's claims are "simply implausible." PWC Br. at 18 and n. 15. Such assertion is remarkable in a motion to dismiss, with the court required to draw all reasonable inferences in Emcore's favor. *Oshiver*, 38 F.3d at 1384. The defendants further argue that independence violations which involved PWC clients other than Emcore are irrelevant to the pattern analysis in this case.

Defendants cite a number of cases for the purported rule that a court may not consider alleged wrongs against persons or associations other than the plaintiff. Yet each of these decisions is factually disjunct from our present circumstance. For example, investor plaintiffs in *Bernstein v. Misk*, 948 F.Supp. 228 (E.D.N.Y.1997) complained of two wholly separable fraudulent schemes: first, that defendants had fraudulently induced the investors to personally guarantee a loan to purchase a hospital building, and second, that one defendant had illegally obtained loans from a bank whose advisory board he served. These alleged undertakings were separated temporally by a two year period; the court found the relevance of the latter allegations to the present facts "difficult to

fathom." *Id.* at 233. Likewise, the decision in *Ray Larsen Assoc., Inc. v. Nikko America, Inc.*, No. 89–2809, 1996 WL 442799 (S.D.N.Y. Aug. 6, 1996) distinguished a plaintiff's allegations of fraud in contractual business dealings from claims that the defendant manufacturer had transferred funds overseas to defraud the IRS. *Id.* at *6. Despite plaintiff's attempts to frame defendants' actions as a "scheme to maximize profits," the court rejected the analogy: "[T]he relationship between the two types of conduct is simply too remote to support a claim under RICO. A finding that this conduct is related would render the requirement of relationship meaningless." *Id.* at *7. *Cf. also Committee to Defend the United States Constitution v. Sun Myung Moon*, 776 F.Supp. 568, 569–572 (D.D.C.1991) (discussing RICO standing, rejecting plaintiff's attempt to plead injury resulting from defendant organization's "wide ranging plan for world domination" despite plaintiff's allegations that organization sought to establish "a centralized system of global financial control as part of ... an 'automatic theocracy to rule the world' ").[6]

In contrast, Emcore pleads that, as a regular way of doing business, the PWC defendants mailed to other clients audit engagement letters and audit letters similar to those sent to Emcore. Am. Compl. ¶ 100. Although plaintiff provides no details about such other letters, purportedly because all relevant information is in the possession of the defendants and third parties, the court finds nothing in Emcore's allegations that approaches the level of disunity addressed in the above decisions. Plaintiff should be allowed to proceed to discovery; the defendants' motion to dismiss for lack of relatedness is denied.

**6.** Plaintiffs in that case sought to combine predicate acts against a group of victims including the Internal Revenue Service, Barbara Walters, prospective ballet students of the Universal Ballet Company and the Washington State Liquor Control Board. The court found the connection among such allegations too remote to support a RICO claim. 776 F.Supp. at 571–72.

Moreover, the court is dubious of the defendants' legal proposition that the court may consider only allegations of wrongs directed toward a RICO plaintiff in conducting the pattern analysis. Defendants correctly cite *Vild v. Visconsi*, 956 F.2d 560, 567 (6th Cir.1992) that, in the Sixth Circuit, a plaintiff may not complain about harm to other entities. But the *Vild* Court specifically acknowledged that some Circuit Courts, including our own, apply a "very liberal version" of the relatedness test, linking conduct "which seems to us to be disconnected or dissimilar." *Id.* at 568 (citing *Banks v. Wolk*, 918 F.2d 418 (3rd Cir.1990)). "We construe the relationship prong more narrowly than the Third Circuit did in Banks." *Id.* The *Banks* Court explained that even actions directed at non-plaintiffs may be considered, holding that under the broad definition of relatedness in *H.J.*, "the fact that [plaintiff] was not a victim of the additional frauds [directed at others] should not carry much weight." 918 F.2d at 424. *See also Swistock*, 884 F.2d at 759.

Our Circuit emphasizes that the relatedness test "will nearly always be satisfied in cases alleging at least two acts of mail fraud stemming from the same fraudulent transaction." *Kehr Packages*, 926 F.2d at 1414. Plaintiff's allegations survive this motion. Whether Emcore can ultimately prove that defendants' acts targeted plaintiff and others alike or even that other PWC clients were affected by defendants' conduct, will be determined later.

## B. Continuity

A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the threat of continuity is demonstrated. *H.J.*, 492 U.S. at 242, 109 S.Ct. 2893.

The parties fiercely debate whether plaintiff's allegations are sufficient to establish "closed-end" continuity, and even whether the court should focus on the length of the alleged fraudulent scheme or the duration of the underlying predicate acts. Compare *Simmerman v. Corino*, 804 F.Supp. 644, 657 n. 23 (D.N.J.1992) (although plaintiffs alleged that "relevant times" spanned approximately 17 months, "it is unclear whether the alleged 'racketeering activities' continued throughout this entire period") to *Tabas*, 47 F.3d at 1294 ("in determining whether or not continuity has been established ... we must focus on the duration of the underlying scheme") and *Kehr Packages*, 926 F.2d at 1414 ("[T]he continuity test requires us to look beyond the [allegedly fraudulent] mailings and examine the underlying scheme or artifice. Although the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis.").

Plaintiff's allegations, read generously, contend that defendants' scheme lasted from at least December 1997 (the first time, after announcement of the merger, that Dougher assured Werthan that PWC would and could continue to serve as independent auditor) until May 1999 (when Emcore fired PWC). *See* Am. Compl. ¶¶ 94, 107, 112. Though our Circuit has repeatedly refused to draw a bright-line rule, *see Hindes v. Castle*, 937 F.2d 868, 875 (3rd Cir.1991) and *Hughes v. Consol–Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3rd Cir.1991), it has not permitted findings of closed-end continuity upon allegations of schemes lasting less than fourteen months. *See Swistock v. Jones*, 884 F.2d 755, 759 (3rd Cir.1989), *but see Pelullo*, 964 F.2d at 210 ("later [Third Circuit] cases have limited Swistock by stressing that the complaint in that case included allegations

of misrepresentations and wrongdoing, which suggested that the period may have been open-ended"). *See also Tabas*, 47 F.3d at 1294 (digesting durational precedent); *Hughes*, 945 F.2d at 610–611 (same).

 This court need not resolve the issue of closed-end continuity because of the alternative inquiry into the open-ended "threat of continued racketeering activity." *H.J.*, 492 U.S. at 242, 109 S.Ct. 2893. Justice Brennan offered a few examples within the "field of possibilities" of ways to demonstrate such threat: "A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit." *Id.* at 242, 109 S.Ct. 2893. And a plaintiff need not be bound by traditional conceptions of "organized crime": the pattern element may be satisfied equally through allegations that predicate acts were conducted by an ongoing and "legitimate" business or RICO enterprise, as by a long-term association that exists "for criminal purposes." Regardless of the type of association, "the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* at 242–43, 109 S.Ct. 2893.

 The defendants' arguments that Emcore has alleged no actionable racketeering activity, and that Emcore may not rely on its suggestion that PWC defrauded other clients, have been earlier rejected. In addition, defendants contend that Emcore cannot allege open-ended continuity because the alleged scheme has terminated. PWC Br. at 23. They refer to a line of decisions that, where the objective of the racketeering activity has been achieved and there is no possibility of recurrence, no threat of continuity can be found. *Hindes v. Castle*, 937 F.2d 868 (3rd Cir. 1991), addressed a claim by the would-be Lieutenant Governor of Delaware against his successful opponents for the seat for illegally misrepresenting the sources and destinations of political contributions. *Id.*

at 869–71. The Third Circuit affirmed the district court's conclusion that the sole objective of the alleged fraudulent scheme, to elect the opposition candidate, had been achieved during the November 1988 election. *Id.* at 874. And, because the successful candidate was precluded by Delaware law from running for another term, the Circuit Court found no possibility of a future threat. *Id.; see also Hughes*, 945 F.2d at 610–611 (no open-ended continuity where plaintiff landowners alleged that defendant railroad and coal companies had misrepresented their interests to induce plaintiffs to sell property at below market value: "Plaintiffs each had but one property to sell; defendants had but one area to acquire.... [The defendants' scheme] was akin to a one time racket to obtain a specific bounty.").

Those cases are inapposite. Instead, the court is impressed by decisions finding continuity where the alleged criminal activity ceased only upon discovery. *See, e.g., Concern Sojuzvneshtrans v. Buyanovski*, 80 F.Supp.2d 273, 279 (D.N.J.1999) (open-ended continuity where defendants allegedly falsified shipping instructions and financial statements as "routine way" of doing business with plaintiff: "Whether the threat existed should be determined by considering the situation at the time the acts were being committed; thus, it is no defense to argue that a threat of continuing activity did not exist because the scheme was discovered."); *Seneca Ins. Co. v. Commercial Transp., Inc.*, 906 F.Supp. 239, 244 (M.D.Pa.1995) (finding openended continuity where "[t]here is ample evidence in the instant case to infer that, without detection, Defendants' alleged scheme might have continued indefinitely."); *Albert Einstein Medical Center v. Physicians Clinical Svcs., Ltd.*, No. 90–3387, 1991 WL 193391, at *4 (E.D.Pa. Sept.19, 1991). The court finds the present facts analogous to an example suggested by Justice Brennan:

> Suppose a hoodlum were to sell 'insurance' to a neighborhood's storekeepers

to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the 'premium' that would continue their 'coverage.' Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity. 492 U.S. at 242, 109 S.Ct. 2893. Both Justice Brennan's hypothetical hoodlum, and defendants here, are charged with committing racketeering acts for an indefinite period, terminable or terminated (voluntarily or otherwise) [7] only upon threat of imminent detection. Plaintiff charges that defendants' criminal activities presented, to Emcore and others, a "distinct threat" of continued duration. *H.J.*, 492 U.S. at 242, 109 S.Ct. 2893; *see also Lehighton Area School Dist. v. Gilbert*, 787 F.Supp. 429, 431 (M.D.Pa.1992) (open-ended continuity where court found "every indication" that defendant would have continued illegal activity had misappropriation not been uncovered by audit, reasoning: "Unless applied retrospectively, the test for the threat of continuing criminal activity is pointless.").

Further, plaintiff argues, the defendants' independence violations were a regular way of conducting PWC business. Am. Compl. ¶ 100; *see generally Tabas*, 47 F.3d at 1295. Bolstered by the SEC's findings, *see* Am. Compl. Exh. A, Emcore alleges that PWC repeatedly violated independence rules—and claims that the accounting partnership sent engagement and audit letters avowing its independence to many, if not all, of its clients. *See* PWC Br. at 18 n. 15. It quotes the January 2000 SEC findings which reported "widespread independence non-compliance at PWC that reflected serious structural and cultural

problems," manifested in thousands of self-reported independence violations engaged in by almost half of PWC's partners. Am. Compl. ¶ 85. The partners in violation allegedly served on PWC's Board, its U.S. Leadership Committee, and its independence compliance program. *Id.* Plaintiff's claims of a culture of fraud at PWC survive this motion; their demonstration awaits trial. Defendants' motion to dismiss for lack of continuity allegations is denied.

## C. Pattern under New Jersey RICO

Defendants also move to dismiss the state law RICO claim (Count IV) for failure to allege a pattern. Surprisingly, although the New Jersey Supreme Court has expressly distinguished New Jersey law regarding RICO "pattern" from the federal statute, neither party refers to a single state court decision on point.

In its *State v. Ball* decision, 141 N.J. 142, 163, 661 A.2d 251 (1995), the Supreme Court interpreted the New Jersey statute's definition of a "pattern of racketeering activity":

(1) Engaging in at least two incidents of racketeering conduct ... the last of which shall have occurred within 10 years ... after a prior incident of racketeering activity; and

(2) A showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

N.J.S.A. 2C:41–1d. That Court acknowledged that the New Jersey definition derives from the federal law. *Id.* at 163, 661 A.2d 251. However, reviewing the differences between states and even among fed-

7. The parties enter an almost metaphysical debate about the cause of the alleged scheme's termination. Plaintiff appears to argue that it fired PWC because of investigation and sanction by the SEC. Am. Compl. ¶ 76.

In contrast, defendants claim that they voluntarily terminated any culpable actions by selling their Emcore holdings. PWC Reply Br. at 10. The court does not resolve this factual dispute on a motion to dismiss.

eral interpretations, it approved the Appellate Division's determination that the state law does not require a separate, two-pronged showing of relatedness and continuity as under federal RICO. Instead, the Court held: "[T]he primary criterion of New Jersey's 'pattern of racketeering activity' is 'relatedness.' That calls for the application of a broad standard involving the totality of all relevant circumstances, which may include 'continuity.'" *Id.* at 166–69, 661 A.2d 251.

So it appears that the New Jersey definition of pattern is more flexible and generous to plaintiffs than the federal standard. This court concludes that Emcore's allegations that numerous PWC partners and associates committed repeated acts of mail and wire fraud, directed at numerous victims, all with the same goals (retaining clients and profits) satisfy New Jersey's pattern test. Defendants' motion to dismiss Count IV on this basis is denied.

## V. RICO Enterprise

The defendants seek to dismiss Count I (association-in-fact enterprise), Count II (PWC as the enterprise) and Count IV (state RICO) of the amended complaint because of various deficiencies related to plaintiff's pleading of a RICO "enterprise." First, they argue that plaintiff has not satisfied the Third Circuit's requirement that the RICO defendants be distinct from the association-in-fact enterprise alleged in Count I. *B.F. Hirsch v. Enright Refining Co., Inc.,* 751 F.2d 628, 633 (3rd Cir.1984). The defendants further move to dismiss PWC as a defendant in Count II because it is named alone as the RICO enterprise. *Id.* In the alternative, the defendants seek dismissal of Counts I and II pursuant to *Reves v. Ernst & Young,* 507 U.S. 170, 184, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), on the theory that liability under § 1962(c) is limited to "those who participate in the operation or management of an enterprise." And finally, defendants contend

that plaintiff's allegations substantiating the enterprises do not meet the standards of *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

### A. Association–in–Fact Enterprise: The Distinctiveness Requirement

Under federal RICO, an "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

Initially, defendants argue that Count I of the amended complaint impermissibly names as defendants the same parties that constitute the alleged association-in-fact enterprise. They rely on the analysis of § 1962(c) in *B.F. Hirsch v. Enright Refining Co., Inc.,* 751 F.2d 628 (3rd Cir.1984):

> It shall be unlawful for any person [8] *employed by or associated with* any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(Emphasis added.) The *Enright* Court, interpreting the statutory requirement that a defendant "person" must be "employed by or associated with" an enterprise, concluded: "[T]he language contemplates that the 'person' must be associated with a separate 'enterprise' before there can be RICO liability on the part of the 'person.'" *Id.* at 633. This conclusion was enforced by the Circuit Court's determination that one purpose of RICO is "to prevent the takeover of legitimate businesses by criminals and corrupt organizations.... It is in keeping with that Congressional scheme to orient section 1962(c) toward punishing the infiltrating criminals rather than the legitimate corporation which might be an innocent victim of the

---

**8.** Under 18 U.S.C. § 1961(3), a RICO "person" "includes any individual or entity capable of holding a legal or beneficial interest in property."

**256**

racketeering activity in some circumstances." *Id.* at 633–34.

Count I of Emcore's amended complaint states in relevant part:

[D]efendants PWC (and its predecessors, Price Waterhouse and Coopers), the PWC Partners and Ricciardi were associated with an enterprise ... consisting of a group of persons associated in fact, to wit, Price Waterhouse, Coopers, the PWC Partners and, upon information and belief, other PWC partners for the period from December 1997 until July 1, 1998, and PWC, the PWC Partners, Ricciardi and, upon information and belief, other PWC partners for the period from July 1, 1998 to date (the "Association–in–Fact Enterprise"), which engages in, and whose activities affect, interstate commerce....

Am. Compl. ¶ 94.

■ The basic principle of *Enright,* that a plaintiff may not name a single corporation as both defendant and enterprise under § 1962(c), remains. *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.,* 46 F.3d 258, 268 (3rd Cir.1995) ("[W]e conclude that the essential holding of Enright remains undisturbed—a claim simply against one corporation as both 'person' and 'enterprise' is not sufficient. Instead, a viable § 1962(c) action requires a claim against defendant 'persons' acting through a distinct 'enterprise.'"). Had Emcore named PWC solely as defendant, and defined the enterprise as PWC alone, dismissal would clearly be mandated.

However, the issue of whether *Enright* bars Emcore's claims as plead is a different inquiry—one more complicated than defendants have portrayed. The defendants rely on a line of Third Circuit authority which addresses the distinctiveness requirement where plaintiffs identified a corporation as the RICO enterprise, and its officers or other employees as defendants. *Petro–Tech, Inc. v. Western Co. of North America,* 824 F.2d 1349, 1359–60 (3rd Cir.1987), expanded *Enright* to preclude even vicarious liability, under a theory of respondeat superior or aiding and abetting liability, of a corporate defendant also named as a RICO enterprise.

And in 1991, the Third Circuit decided *Brittingham v. Mobil Corp.,* 943 F.2d 297 (3rd Cir.1991), where plaintiffs had sued the corporation Mobil and its subsidiary Mobil Chemical, but had not named individual officers as defendants. The alleged enterprise was described as an association-in-fact composed of the two defendant corporations, together with advertising agencies they had engaged to market (allegedly fraudulently) a new product. *Id.* at 300:

Plaintiffs assert that since the "association-in-fact" enterprise is facially distinct from the defendants, the Enright rule is inapplicable.... We agree with the district court that the alleged enterprise is not distinct from the defendants for purposes of the Enright rule.... A corporation must always act through its employees and agents, and any corporate act will be accomplished through an "association" of these individuals or entities. Consequently, the Enright rule would be eviscerated if a plaintiff could successfully plead that the enterprise consists of a defendant corporation in association with employees, agents, or affiliated entities acting on its behalf.... Our decision is in accord with numerous courts that have rejected attempts to circumvent the distinctiveness requirement by alleging enterprises that are merely combinations of individuals or entities affiliated with a defendant corporation.

*Id.* at 300–301.

By analogy, defendants argue that the PWC partnership can act only through its partners, employees and agents (including the PWC partners and Ricciardi). Relying on *Brittingham,* they conclude that Emcore has impermissibly collapsed its allegations, and that the § 1962(c) claim must be dismissed because "the enterprise and defendant, although facially distinct, are in reality no different from each other." *Id.* at 303 (analyzing *Petro–Tech* ). *See also*

*Glessner v. Kenny,* 952 F.2d 702, 713–14 (3rd Cir.1991) (relying on *Brittingham* to analyze plaintiffs' theory that individual officer and employee defendants should be liable for conducting racketeering activity through corporate enterprises); *Gasoline Sales v. Aero,* 39 F.3d 70, 73 (3rd Cir.1994) ("Where the employees merely participate in the corporation's own fraud by acting as corporate agents ... the employees may not be sued under section 1962(c). We have stated that this interpretation of 1962(c) 'avoids the absurd result that a corporation may always be pled to be the enterprise controlled by its employees or officers.'" (quoting *Glessner*)).

The defendants' argument is not convincing. Primarily, the court notes that the *Brittingham–Glessner* approach to corporate distinctiveness was overruled by *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.,* 46 F.3d 258 (3rd Cir.1995). Our Circuit Court "reconsidered" its civil RICO jurisprudence in light of evolving Supreme Court precedent,[9] and concluded that one rationale for the distinctiveness requirement had been "clearly emasculated." *Id.* at 263. Specifically, the Circuit found that the Supreme Court's decision of *Sedima v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), had shaken *Enright*'s underpinnings of theories of "outside" criminals infiltrating "innocent" or "passive" corporations:

> Instead of being used against mobsters and organized criminals, [RICO] has become a tool for everyday fraud cases brought against respected and legitimate enterprises. Yet Congress wanted to reach both legitimate and illegitimate enterprises. The former enjoy neither an inherent incapacity for criminal activity nor immunity for its consequences.

*Id.* at 262–63 (quoting *Sedima,* 473 U.S. at 499, 105 S.Ct. 3275). And so, the *Jaguar* Court overruled *Petro–Tech,*

*Glessner,* and *Brittingham* to the extent they relied on "a re-incarnation of the defunct infiltrating racketeer rationale." *Id.* at 263. The Third Circuit rewrote its distinctiveness requirement to allow § 1962(c) claims against officers or employees who participate in the "operation or management," *see Reves v. Ernst & Young,* 507 U.S. 170, 179, 184, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), of a corporate enterprise. In so doing, and consistent with *Reves,* the *Jaguar* Court eliminated the earlier distinction between "inside" managers and "outside" racketeering defendants. It reasoned simply: "A corporation is an entity legally distinct from its officers or employees, which satisfies the 'enterprise' definition of [RICO]." *Id.* at 268. *See also Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 655 (3rd Cir.1998) ("Following our decision in Jaguar Cars, the enterprise/person distinction no longer constituted a grounds for dismissing [plaintiffs'] RICO claims" against the officers, directors and controlling shareholders of a corporate enterprise.).

██ It is clear, then, that the defendants' reliance on the *Brittingham* line of authority to dispose of Emcore's claims against the PWC partners and Ricciardi is misplaced. Under *Jaguar* and *Reves,* corporate insiders who participate in the operation or management of a corporate enterprise can be held liable for RICO violations. Whether Emcore has met the *Reves* standard for pleading actionable conduct by the defendant PWC partners and Ricciardi will be discussed below. For now, the court denies the individual defendants' motion to dismiss Count I because of Emcore's alleged failure to satisfy our circuit's "distinctiveness" requirement.

---

**9.** The *Jaguar* Court considered the impact of *Sedima v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) and *National Organiza-* *tion for Women v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), on its admittedly "oblique" and "unfortunate" distinctiveness doctrine. 46 F.3d at 263.

This conclusion rests on additional support. Even before *Jaguar*, the Third Circuit had crafted an exception to the rule that the agents [10] of a corporate enterprise, and the enterprise itself, are deemed legally identical and insulated under § 1962(c). The *Brittingham* Court recognized that a defendant corporation might assume a role as "active perpetrator" of racketeering activity that is distinct from the actions of those acting on its behalf: "It is theoretically possible for a corporation to take a separate 'active' role in RICO violations also committed by its employees." 943 F.2d at 302. However, *Brittingham* concluded that its plaintiffs had not alleged that the defendant corporations, and the individuals and entities acting on their behalf, had undertaken separate roles in the racketeering activities. *Id.* at 301–302.

Since then the Third Circuit has threaded this theme through its opinions. *See Glessner*, 952 F.2d at 712–14 (dismissing claims against corporate defendants because "we are dealing with an alleged marketing fraud in which the [corporate defendants] had no separate active roles in the alleged racketeering activity apart from the actions of their agents and affiliates that also comprise part of the plaintiffs' alleged 'association in fact'"; dismissing claims against individual defendants where their only alleged activity was to receive income as officers and principals of the corporations); *see also Lorenz v. CSX Corp.*, 1 F.3d 1406, 1412 (3rd Cir.1993) ("After Brittingham and Glessner, it is still theoretically possible for a parent corporation to be the defendant and its subsidiary to be the enterprise under section 1962(c).... A RICO claim under section 1962(c) is not stated where the subsidiary merely acts on behalf of, or to the benefit of, its parent."); *Gasoline Sales*, 39 F.3d at 73–74 ("[W]e have interpreted corporate identity expansively, so that the actions of a corporation's agents conducting its normal affairs are constructively its own ac-

tions for section 1962(c) purposes"; recognizing that exception might exist where plaintiff alleges that corporate enterprise undertook role distinct from its subsidiaries or employees). Importantly, the *Jaguar* Court acknowledged the continuing vitality of this doctrine. Discussing its new holding that a § 1962(c) claim could sometimes stand against officers conducting racketeering activity through a corporate enterprise, the Third Circuit commented that the rule was not "absurd" or circular because "[i]n such an action, the plaintiff can only recover against the defendant officers and cannot recover against the corporation simply by pleading the officers as the persons controlling the corporate enterprise.... Instead, a corporation would be liable under § 1962(c), only if it engages in racketeering activity as a 'person' in another distinct 'enterprise,' since only 'persons' are liable for violating § 1962(c)." 46 F.3d at 268. Tellingly, the *Jaguar* Court quoted Seventh Circuit Judge Posner's observation in *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir.1985): "The only important thing is that it [the enterprise] be either formally (as when there is incorporation) or practically (as when there are other people besides the proprietor working in the organization) separable from the individual." *Id.* at 269 (permitting claim against individual defendant whose sole proprietorship was named as enterprise).

The lesson of this overlooked exception is that a RICO plaintiff may alternatively satisfy the Third Circuit's distinctiveness requirement by alleging that a corporate enterprise and its agents undertook separable roles in racketeering activities. In this circuit a plaintiff can state a claim against individual defendants by alleging that they, though agents of a corporate enterprise, conducted racketeering acts in their private capacity and to their own benefit. As applied here, if Emcore has alleged that the PWC partners and

---

**10.** This jurisprudence has variously viewed individual employees, subsidiary corpora- tions, and others as "agents" of a corporate enterprise.

Ricciardi committed acts other than conducting the "normal affairs" of the corporation, *see Gasoline Sales,* its claims against these defendants may stand.[11] Emcore has done so.

Plaintiff argues that the individual defendants failed to dispose of their personal equity interests in Emcore, failed to disclose their interests in Emcore and other audit clients to such clients, and possibly failed to disclose their ownership interests on PWC internal reports and during the internal investigation conducted pursuant to the SEC Settlement Order. Am. Compl. ¶ 97; *see also* Emcore Br. at 18 ("Each of the PWC Partner[s'] acts relating to his personal ownership of EMCORE stock, including the failure to dispose of the stock and the concealment from EMCORE of that ownership, were [sic] conducted not as partners or agents of PWC, but as distinct individuals seeking personal gain."). And, plaintiff contends, these actions constitute actionable mail and wire fraud, independent of the conduct of the PWC partnership or the alleged association-in-fact. Am. Compl. ¶¶ 99–101. Such allegations satisfy the "active role" exception defined in *Brittingham* and its successors. Emcore has clearly plead that the individual defendants engaged in activities beyond, and separable from, the normal affairs of the PWC partnership. And de-

spite defendants' suggestion, the court does not find dispositive Emcore's allegation that the PWC partners and Ricciardi conducted "*some* of the racketeering activities alleged herein as partners and/or agents of PwC," *see* Am. Compl. ¶ 109 (emphasis added). That alone does not resolve whether the individual defendants acted in concert with the enterprise. Accordingly, on this alternative basis, the motion by the individual defendants to dismiss Count I of the amended complaint is denied.

 This analysis leaves open one remaining question: May Emcore sue the PWC partnership as a defendant, where the partnership is also named as one element of the association-in-fact enterprise? In other words, may a corporation that forms part of an enterprise, together with its affiliates or agents, be held liable as a RICO "person"? As noted, the *Jaguar* Court seemed to permit this possibility: "[T]he plaintiff . . . cannot recover against the corporation simply by pleading the officers as the persons controlling the corporate enterprise . . . Instead, a corporation would be liable under § 1962(c), only if it engages in racketeering activity as a 'person' in another distinct 'enterprise,' since only 'persons' are liable for violating § 1962(c)." 46 F.3d at 267 (citing *Petro-Tech* ).[12]

---

11. The decisions cited by defendants are in accord. *See Metcalf v. PaineWebber Inc.,* 886 F.Supp. 503, 512–14 (W.D.Pa.1995) (to satisfy distinctiveness requirement, "a complaint must include an allegation that the enterprise included some person or entity operating outside of the defendant's or defendants' normal scope of business"), *aff'd,* 79 F.3d 1138 (3rd Cir.1996); *see also Dow Chemical Co. v. Exxon Corp.,* 30 F.Supp.2d 673, 699–702 (D.Del. 1998). *Caldwell v. KFC Corp.,* 958 F.Supp. 962 (D.N.J.1997), cited in defendants' reply brief, discusses vicarious liability for a common-law battery claim and makes no mention of the RICO statute.

12. Because the plaintiff in *Jaguar* did not seek recovery from the corporation as a § 1962(c) defendant, that Court did not actually decide the issue. 46 F.3d at 268. However, it offered in a footnote this tantalizing clue:

"Commentators have observed that the plaintiffs in Reves could possibly have satisfied the operation and management requirement of § 1962(c) had they alleged the existence of another enterprise. In Reves the enterprise was the Co-op [the client of defendant accountants], but this is not the only possibility. . . . RICO's enterprise requirement can be satisfied [under the definitions of § 1962] by 'a group of individuals associated in fact' even though not a distinct 'legal entity.' What if plaintiff in Reves had alleged that an association in fact consisting of Arthur Young [predecessor to the accountant defendants], . . . Jack White [the Co-op's General Manager], and the Co-op constituted the racketeering enterprise, and that Arthur Young directed the affairs of this 'enterprise?' " 46 F.3d at 266 n. 5. *See Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).

Unfortunately, earlier Third Circuit decisions had reached apparently conflicting results concerning what might constitute such "other distinct enterprise." In some cases, the Circuit Court has squarely permitted liability of a corporate defendant, where the corporation was named as part of an association-in-fact. *See, e.g., Petro-Tech,* 824 F.2d at 1361 (permitting claim against defendant corporation where plaintiff alleged association-in-fact of corporation and its employees: "Because [defendant corporation] Western is alleged to have attempted to benefit from its employees' racketeering activity, it is appropriate to allow the victims of that activity to recover from Western."); *Glessner,* 952 F.2d at 711 (reaffirming in dicta that aspect of *PetroTech* ); *Brittingham,* 943 F.2d at 302 ("Without allegations or evidence that the defendant corporation had a role in the racketeering activity that was distinct from the undertakings of those acting on its behalf, the distinctiveness requirement is not satisfied.").

Yet in other opinions, the Circuit Court has not permitted such agglomerative approach. *See Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1165–66 (3rd Cir.1989) (enterprise comprised of three corporate defendants in association was permissible under statutory, "liberal" definition of enterprise; finding that plaintiff "by definition met the association requirement in pleading that the three [defendant] companies associated to form an enterprise"), *abrogated on other grounds, Beck v. Prupis,* —— U.S. ——, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000), *and disapproved by Brittingham,* 943 F.2d at 302 n. 3 (acknowledging the *Shearin* conclusion but commenting that "we did not [there] discuss the distinctiveness requirement."). *And see Banks v. Wolk,* 918 F.2d 418, 421 (3rd Cir.1990) (prohibiting liability against corporate defendants named as the RICO enterprises); *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1411 (3rd Cir. 1991) (dismissing § 1962(c) claim against defendant also named as enterprise); *Gasoline Sales,* 39 F.3d at 72–73 (where sub-

sidiaries were identified as enterprises, they could not be named as defendants; and allegations that corporation acted in concert with its subsidiaries fell under rule that "a corporation generally cannot be a defendant under section 1962(c) for conducting an 'enterprise' consisting of its own subsidiaries or employees, or consisting of the corporation itself in association with its subsidiaries or employees") (quoting *Brittingham, Glessner* ), *abrogated on other grounds, Jaguar,* 46 F.3d at 266 n. 6.

District court decisions following *Jaguar* have likewise differed on this issue. *See, e.g., Dow Chemical Co. v. Exxon Corp.,* 30 F.Supp.2d 673, 699–702 and n. 41 (D.Del. 1998) (rejecting argument that a corporation may be held liable for racketeering through association-in-fact composed of corporation, employees, subsidiaries and affiliates); *Eli Lilly,* 23 F.Supp.2d at 489 n. 43 (concluding that Jaguar "only decided whether corporate officers and directors may be considered distinct from their corporation," and does not reach the issue of distinctiveness between a parent corporation and its subsidiaries or affiliates); *Kaiser v. Stewart,* No. 96–6643, 1997 WL 476455, at *9 (E.D.Pa. Aug.19, 1997) (concluding that, where corporations and individuals were named as defendant "persons," and identical group was identified as association-in-fact enterprise, RICO claim failed distinctiveness requirement). *But see Schuylkill Skyport Inn v. Rich,* No. 95–3128, 1996 WL 502280, at *31–32 (E.D.Pa. Aug.21, 1996) (finding distinctiveness where attorney defendants were named as both persons and part of the enterprise).

Given this lack of clear guidance, this court chooses to follow the lead of two analogous, well-reasoned district court decisions. *PTI Services, Inc. v. Quotron Systems, Inc.,* No. 94–2068, 1995 WL 241411, at *12 (E.D.Pa. April 19, 1995) concluded, citing *Enright* and *Shearin,* that a corporation could serve dual roles as both RICO defendant and member of en-

terprise: "[A]n entity may be a member of an association-in-fact enterprise while simultaneously conducting or participating in the activity of the enterprise as a RICO person." And *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* No. 95–1698, 1995 WL 455969 (E.D.Pa. July 27, 1995) permitted § 1962(c) claims against defendant corporations and individuals, where the collective association of defendants was alleged as the enterprise. Judge Newcomer reasoned:

> No defendant is alleged to be both a RICO person and the RICO enterprise; they are all alleged to be both RICO person and component of the RICO enterprise. This Court can discern no principled distinction between Jaguar Cars, where the corporation was held distinct from its officers/employees despite the fact that a corporation is nothing more than a legal fiction unable to act except through its officers/employees, and the instant case, where the alleged association in fact may be regarded as distinct from its members even though it only acts through one or more of the members. A part of the whole does not share identity with the whole.

*Id.* at *6; *see also Hanrahan v. Britt,* No. 94–4615, 1995 WL 422840, at *7 (E.D.Pa. July 11, 1995).

That approach strikes this court as sound and best grounded in the Third Circuit's existing distinctiveness jurisprudence. Judge Newcomer aptly surmised that *Jaguar* rests upon a constructive, legal differentiation between a corporation and its officers; this court agrees that the conception that a corporation must always act through its agents has become outdated by Third Circuit analysis. Further, this court interprets the *Brittingham–Glessner* "active participant" exception as guidance that a corporation can be a RICO defendant, so long as the corporation's actions are separable from those of its agents.

This court has already concluded that the alleged actions of the individual defendants are distinguishable from those of the enterprise alleged in Count I. Now, for the reasons expressed above, the court decides the companion proposition that PWC is analytically separable from the association-in-fact. The motion by PWC to dismiss Count I for failure to satisfy the *Enright* rule is denied.

**B. Distinctiveness: PWC as the Enterprise**

Moving on to Count II, the defendants seek dismissal of the § 1962(c) claims against the PWC partnership, where Emcore has named the partnership as the enterprise. *See* Am. Compl. ¶¶ 106–110. They rely, of course, on our circuit's distinctiveness decisions beginning with *Enright.*

Though this count is captioned "Racketeering Against All Defendants," the underlying allegations accuse only the individual PWC partners and Ricciardi of misbehavior. Emcore's amended complaint does not request liability against the PWC partnership on this claim, and its brief does not contest this issue. Emcore Br. at 17–19 (discussing distinctiveness requirement only concerning individual defendants). It appears that plaintiff has conceded this issue.

Moreover, the court concludes that the *Enright* distinctiveness rule remains viable on this point: under the language of § 1962(c), "[T]he 'person' must be employed by or associated with an 'enterprise.' ... [T]he language contemplates that the 'person' must be associated with a separate 'enterprise' before there can be RICO liability on the part of the 'person.'" 751 F.2d at 633. The foundation of that statement is sound; a party cannot associate with itself. *See McCullough v. Suter,* 757 F.2d 142, 144 (7th Cir.1985) (Posner, J.); *Haroco, Inc. v. American Nat. Bank and Trust Co. of Chicago,* 747 F.2d 384, 400 (7th Cir.1984).

The motion by the PWC partnership to dismiss Count II of the amended complaint against solely that defendant is granted.

## C. Operation or Management

 As said, to survive this motion, the plaintiff must allege that the defendants "participated in the operation or management" of the relevant enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 184, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). The *Reves* Court, considering the potential RICO liability of an accounting firm whose client had been accused of securities fraud,[13] interpreted the § 1962(c) phrase, "to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs...." Justice Blackmun determined that the term "conduct" referred to "an element of direction," and likewise concluded: "[T]he word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs ... some part in directing the enterprise's affairs is required." *Id.* at 178–179, 113 S.Ct. 1163. The Court then clarified the reach of the statute, observing that although an enterprise can be operated by upper management and by "lower rung participants in the enterprise who are under the direction of upper management," the statute does not reach "complete 'outsiders' " who take no part in the conduct of the enterprise. *Id.* at 184–85, 113 S.Ct. 1163; *see also Jaguar*, 46 F.3d at 265–66.

 Defendants seek to dismiss federal RICO Counts I and II under this definition. They argue that Emcore has alleged neither a connection among the individual defendants, nor that the individual defendants assumed a role in directing the alleged enterprises. "[N]ot even action involving some degree of decisionmaking constitutes participation in the affairs of an

enterprise." *Univ. of Maryland v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1538–39 (3rd Cir.1993) (no liability against auditor of bankrupt insurance company). According to defendants, Emcore's uncontested allegations that defendant Schiro is CEO of Pricewaterhouse Coopers, and defendant Ricciardi its in-house counsel, are insufficient under *Reves*.

Their analysis is off target. The decisions cited by defendants analyze, as did *Reves*, the appropriateness of naming as RICO defendants persons outside the "chain of command" of an enterprise. *MCM Partners, Inc. v. Andrews–Bartlett & Assoc., Inc.*, 62 F.3d 967, 978 (7th Cir. 1995) (quoting *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir.1994)). The *Reves* defendants had served as auditors for a corrupt corporation; the Court was there concerned about the wisdom of imposing liability upon such outsiders.[14] Likewise, *Gilmore v. Berg*, 820 F.Supp. 179, 182–83 (D.N.J.1993), excused attorneys accused of preparing misleading opinion letters on behalf of corporate clients: "[T]hese are all common professional services typically rendered by attorneys for their business clients." *See also Amalgamated Bank of New York v. Marsh*, 823 F.Supp. 209, 220 (S.D.N.Y.1993) (barring § 1962(c) liability against restaurant defendant whose owner had funneled funds embezzled from bank through restaurant's accounts). The First Circuit confirms:

> *Reves* is a case about the liability of outsiders who may assist the enterprise's affairs. Special care is required in translating *Reves'* concern with "horizontal" connections—focusing on the liability of an outside adviser—into the "vertical" question of how far RICO liability may extend within the enterprise but down the organizational ladder. In

---

13. Note that the *Reves* Court faced only the question of the accountants' liability, because all other defendants (presumably including the client Co-op and its members/employees) had settled. 507 U.S. at 175, 113 S.Ct. 1163.

14. For a thorough analysis of later judicial interpretation of *Reves*, see Christopher W. Madel, *The Modern RICO Enterprise: The In-operation and Mismanagement of Reves v. Ernst & Young*, 71 Tul. L.Rev. 1133 (1997).

our view, the reason the accountants were not liable in *Reves* is that, while they were undeniably involved in the enterprise's decisions, they neither made those decisions nor carried them out; in other words, the accountants were outside the chain of command through which the enterprise's affairs were conducted.

*United States v. Oreto*, 37 F.3d 739, 750 (1st Cir.1994), *quoted in MCM Partners*, 62 F.3d at 978.

This court is guided by our Circuit's reading of *Reves:* "[T]he 'operation or management' test is designed to limit RICO liability under § 1962(c) to those situations in which the government can demonstrate 'a nexus between the person and the conduct in the affairs of an enterprise.'" *U.S. v. Parise*, 159 F.3d 790, 796 (3rd Cir.1998) (noting that "operation or management" test applies to criminal and civil RICO cases alike); *see also U.S. v. Antar*, 53 F.3d 568, 580 (3rd Cir.1995) ("the person being sued must exercise some control over the enterprise"). Again, "RICO liability extends to those 'plainly integral to carrying out' the enterprise's activities." *Parise*, 159 F.3d at 796 (quoting *United States v. Shifman*, 124 F.3d 31, 36 (1st Cir.1997)).

Emcore asserts that each individual defendant served PWC as CEO, partner, or in-house counsel: the defendants conducted or participated in the partnership's affairs. *See* Am. Compl. Count II (naming PWC as enterprise). Identical are the allegations of the defendants' roles in the association-in-fact enterprise described in Count I. Far from "unwitting footsoldiers," *131 Main Street Assoc. v. Manko*, 897 F.Supp. 1507, 1527 (S.D.N.Y.1995), the defendants here are alleged to be "part of the enterprise itself." *MCM Partners*, 62 F.3d at 979. At this pleading stage, that is adequate; the defendants' motion to dismiss Counts I and II under the *Reves* "operation or management" test is denied.

## D. Sufficiency of Enterprise Allegations

Finally, defendants object that Emcore has not established that either enterprise alleged meets the statutory definition of "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact, though not a legal entity." 18 U.S.C. § 1961(4). Relying on *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) and *State v. Ball*, 141 N.J. at 156–162, 661 A.2d 251, they move to dismiss plaintiff's substantive federal and state RICO claims (Counts I, II and IV).

In particular, defendants claim that Emcore has not alleged the three elements of an enterprise, as postulated by the Third Circuit: 1) an ongoing organization with some sort of framework for making or carrying out decisions; 2) the various associates function as a continuing unit; and 3) the enterprise is separate and apart from the pattern of activity in which it engages. *United States v. Pelullo*, 964 F.2d 193, 211 (3rd Cir.1992) (citing *U.S. v. Riccobene*, 709 F.2d 214, 221–24 (3rd Cir. 1983)).

Defendants are correct that these elements must eventually be demonstrated in order that plaintiff prevail at trial. *See, e.g., Turkette*, 452 U.S. at 593, 101 S.Ct. 2524 (reversing criminal conviction); *Riccobene*, 709 F.2d at 216 (evidence sufficient to affirm criminal conviction); *State v. Ball*, 141 N.J. at 156, 661 A.2d 251 (affirming convictions under New Jersey RICO). But at this stage, plaintiff's citation to *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786 (3rd Cir.1984), where the Circuit mandated a more generous standard for review of the pleadings, is more apt. The *Seville* Court chided (and reversed) a district court which had "confused what must be pleaded with what must be proved.... The district court erred in applying the Riccobene–Turkette proof analysis to the allegations in [the]

complaint." *Id.* at 790. Instead, the Court held that a plaintiff need only identify the entities it believes constitute the RICO enterprises: "The rules of pleading require nothing more at this early juncture than that bare allegation." *Id.; see also Standard Chlorine of Delaware, Inc. v. Sinibaldi,* 821 F.Supp. 232, 240–42 (D.Del. 1992).

Applying such standard of review, this court readily approves plaintiff's enterprise allegations. Emcore has clearly identified two enterprises in its complaint. "[I]t is the function of discovery to fill in the details, and of trial to establish fully each element of the cause of action." *Standard Chlorine,* 821 F.Supp. at 241.

In an effort to raise this pleading bar, defendants now argue that plaintiff's own allegations negate the existence of various elements of the enterprise. *See, e.g., Federal Ins. Co. v. Ayers,* 741 F.Supp. 1179, 1184 (E.D.Pa.1990). They first claim that, based on allegations included in plaintiff's original complaint but deleted from the amended complaint, Emcore suggests that the PWC partners and PWC pursued "inherently contradictory goals," and thus fails to demonstrate that such parties "shared a common purpose." *Moll v. U.S. Life Title Ins. Co.,* 654 F.Supp. 1012, 1031 (S.D.N.Y.1987). This argument, based on superseded pleadings and Second Circuit law, does not comport with the approach of *Seville,* "designed to eliminate the vagaries of technical pleading," 742 F.2d at 790, and is rejected.

The motion to dismiss is accordingly denied. So too are defendants' premature arguments of alleged lack of separate enterprise structure, *see* PWC Br. at 29–32.

## VI. RICO Conspiracy

Emcore charges defendants with conspiracy to violate federal and state RICO, Counts III and V respectively. It is appropriate to hold a defendant liable for conspiracy to violate RICO under § 1962(d) even if he or she cannot be held directly liable under § 1962(a), (b) or (c).

*U.S. v. Antar,* 53 F.3d 568, 580 (3rd Cir. 1995). "[O]ne violates § 1962(d) . . . when she agrees to violate a substantive RICO offense, regardless of whether she personally agreed to commit the predicate crimes or actually participated in the commission of those crimes." *Id.* (citation omitted). "The government need only prove that the defendant agreed to conduct the affairs of the enterprise through a pattern of racketeering activity to be accomplished through the acts of co-conspirators." *U.S. v. Pungitore,* 910 F.2d 1084, 1130 (3rd Cir.1990). Nonetheless, defendants move to dismiss plaintiff's federal and state RICO conspiracy claims.

The parties agree that to state a claim for conspiracy to violate RICO, Emcore "must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose," as well as an agreement to commit predicate acts and "knowledge that the acts were part of a pattern of racketeering activity." *Shearin,* 885 F.2d 1162 at 1166–67, *abrogated on other grounds, Beck v. Prupis,* —— U.S. ——, ——, 120 S.Ct. 1608, 1613, 146 L.Ed.2d 561 (2000). *See also State v. Ball,* 141 N.J. at 175, 661 A.2d 251. Though plaintiff must fairly apprise defendants of the basis of its conspiracy charges, the heightened pleading standards of Fed.R.Civ.P. 9(b) do not apply here. *Rose v. Bartle,* 871 F.2d 331, 366 (3rd Cir.1989).

### A. Substantive Liability

Defendants first note that to ground liability under the federal conspiracy statute, 18 U.S.C. § 1962(d), Emcore must allege that the defendants conspired "to do something for which, if the act was completed successfully, he or she would be liable under section 1962(c)." *Antar,* 53 F.3d at 581 (3rd Cir.1995); 18 U.S.C. § 1962(d) (making it unlawful to conspire to violate 18 U.S.C. § 1962(a), (b), or (c)). *See also Beck v. Prupis,* —— U.S. ——,

——, 120 S.Ct. 1608, 1613, 146 L.Ed.2d 561 (2000) (dismissing RICO conspiracy claim where plaintiff's injuries arose from the termination of his employment—not from actionable racketeering activity). Defendants argue that they had no part in directing the affairs of the alleged enterprises. PWC Br. at 38. Because they cannot be held liable for a substantive RICO offense, they claim, they avoid the conspiracy charge as well.

The court has already rejected that reasoning and approved plaintiff's allegations that defendants violated the substantive provision § 1962(c). It follows that defendants' argument here fails.

### B. Conspiracy Allegations

Defendants next object that plaintiff's allegations of conspiracy are conclusory and fail to give defendants fair notice under Fed.R.Civ.P. 8. They argue that Emcore's conspiracy allegations fail to "delineate among the defendants as to their participation or responsibilities in making the statements [or performing the acts] which are the subject of the suit. Conspiracies described in sweeping or general terms cannot serve as the basis as the cause of action, and may be dismissed." PWC Br. at 35 (citing *Chambers Dev. Co., Inc. v. Browning–Ferris Indus.*, 590 F.Supp. 1528, 1538 (W.D.Pa.1984)).

Plaintiff's amended complaint alleges:

Upon information and belief, from in or about December 1997 and continuing until at least in or about May 1999, defendants, being persons associated with an enterprise which engaged in, and whose activities affected, interstate commerce, knowingly, [willfully] and unlawfully conspired and agreed to conduct and participate, directly and indirectly, in the conduct of the affairs and activities of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and 1962(d), by each defendant agreeing to personally commit or aid and abet the commission of at least two of the acts of racketeering with

which each defendant is charged herein. . . .

The object of the conspiracy was to secure, through fraud, the continued benefits to the PWC Partners of equity ownership in EMCORE, while ensuring, through fraud, that defendants retain EMCORE as a profitable client, despite the fact that PWC was not independent with respect to EMCORE, all as set forth herein.

Am. Compl. ¶¶ 112–113. Further, Emcore clarifies its conspiracy counts through incorporation by reference of most of the substantive allegations made elsewhere in the complaint. *Id.* ¶¶ 111, 118; *see Rose v. Bartle,* 871 F.2d 331, 366 (3rd Cir.1989).

The court finds these allegations neither vague nor conclusory. The defendants' reliance on *Heintz Corp. v. Electro Methods, Inc.,* No. 94–6916, 1995 WL 405721, at *4 (E.D.Pa. June 20, 1995), where plaintiff failed to even plead that each individual defendant was part of the RICO conspiracy, is unavailing. Emcore has adequately alleged the defendants' separable participation in the predicate offenses; the court permits plaintiff to conduct discovery concerning their knowledge of and role in the alleged fraudulent scheme. Whether the defendants' alleged actions were conducted in concert, or merely constituted "parallel but independent action," will be determined by the fact finder. *See Loftus v. Southeastern Pennsylvania Transp. Auth.,* 843 F.Supp. 981, 986 (E.D.Pa.1994). Plaintiff will be required to prove "what defendants knew, and when they knew it."

### C. Civil Intracorporate Conspiracy

Finally, defendants attempt to revive their "distinctiveness" theory: they claim that "an intracorporate conspiracy comprised solely of a corporation acting in concert with its officers and employees" is not actionable under civil RICO. PWC Br. at 38 (citation omitted). Here again the question posed is whether a corporation

and its agents may be considered separate actors under the law.

The district court opinions offered by defendants answer in the negative. *See, e.g., Franks v. O'Connor Corp.,* No. 92–0947, 1992 WL 301266, at *9 (E.D.Pa. 1992); *Northeast Jet Center, Ltd. v. Lehigh–Northampton Airport Auth.,* 767 F.Supp. 672, 684 (E.D.Pa.1991); *In re Alamo Car Rental Litig.,* No. 89–0121, 1990 WL 209317, at *2 (E.D.Pa.1990). Yet these decisions spring from the premise that "[a] corporation, legally conceived, is only one person" under RICO. *In re Alamo,* 1990 WL 209317, at *2. This court has earlier abandoned that belief in its analysis of plaintiff's substantive RICO allegations: and so too here. According to Emcore, this is not a case in which "a corporation is alleged essentially to have done nothing more than act in concert with its officers and employees." *Id.* at *3. On this motion to dismiss, the court is compelled to agree. *See also Hughes v. Technology Licensing Consultants, Inc.,* 815 F.Supp. 847, 851 (W.D.Pa.1992) (*"While conducting company business,* [employees] cannot conspire with the corporation of which they form an indispensable part.... An exception is recognized where the plaintiffs allege in good faith that the employees acted solely in their own interest and not for the employer.") (emphasis added); *McLendon v. Continental Group, Inc.,* 602 F.Supp. 1492, 1510 (D.N.J.1985) (if alleged conspirators are officers or employees of the corporate defendant, "plaintiffs should be prepared to prove, and must allege in good faith, that such officers or employees ... acted in pursuit of their own ends, rather than for the benefit and on behalf of the defendant corporation"; reviewing precedent).

Defendants' motion to dismiss the federal and state RICO conspiracy counts is denied.

## VII. State Law Claims

Finally, defendants argue that judicial economy would be served by dismissal of the remaining state law claims for lack of original subject matter jurisdiction. *See* 28 U.S.C. § 1367(c)(3). Such request, predicated on the unrealized assumption that the court would reject plaintiff's federal RICO claims, is denied.

### ORDER

Defendants move to dismiss plaintiff's amended complaint pursuant to Fed. R.Civ.P. 12(b)(6) and 9(b). The court heard oral argument on June 26, 2000. Upon consideration of the submissions of the parties,

It is this 6th day of July, 2000:

ORDERED that:

1) Defendants' motion to dismiss Emcore's federal and state RICO claims (Counts I, II, III, IV and V) is denied in all respects, *except* that

2) The motion to dismiss Count II against solely the PWC partnership for lack of distinctiveness is granted; and

3) Defendants' motion to dismiss plaintiff's other state law claims (Counts VI—XI) is denied.